

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-9-1999

# USA v. Morelli

Precedential or Non-Precedential:

Docket 96-5144,96-5389

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Morelli" (1999). *1999 Decisions.* Paper 59.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/59

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 9, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 96-5144 and 96-5389

UNITED STATES OF AMERICA

v.

MORELLI, ANTHONY
(D.C. Crim. No. 93-cr-00210-1)
Appellant in No. 96-5144

(Amended per Clerk's order of 7/8/98)

UNITED STATES OF AMERICA

v.

IGOR ROIZMAN, a/k/a Little Igor
(D.C. Crim. No. 93-cr-00210-10)
IGOR ROIZMAN, Appellant in No. 96-5389

On Appeal From the United States District Court
For the District of New Jersey
District Judge: Honorable William G. Bassler

Argued: June 5, 1997
Reargued: September 8, 1998

Before: BECKER, Chief Judge, SCIRICA, Circuit Judge,
and KELLY, District Judge.*

(Filed March 9, 1999)

_____

*Honorable James McGirr Kelly, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

JUDD BURSTEIN, ESQUIRE
 (ARGUED)
MARC FERNICH, ESQUIRE
Burstein & Fass LLP
1790 Broadway
New York, NY 10019

Counsel for Appellant
Igor Roizman

MICHAEL S. VOGEL, ESQUIRE
Allegaert, Berger & Vogel LLP
111 Broadway
New York, NY 10006

NICHOLAS A. GRAVANTE, JR.,
 ESQUIRE (ARGUED)
Barrett, Gravante, Carpinello &
 Stern LLP
1585 Broadway
New York, NY 10036

RICHARD A. REHBOCK, ESQUIRE
Law Office of Richard A. Rehbock
One Maple Run Drive
Jericho, NY 11753

Counsel for Appellant
Anthony Morelli

FAITH S. HOCHBERG, ESQUIRE
United States Attorney
GEORGE S. LEONE, ESQUIRE
Assistant United States Attorney
ELIZABETH S. FERGUSON,
 ESQUIRE (ARGUED)
Assistant United States Attorney
970 Broad Street – Room 700
Newark, NJ 07102

Counsel for Appellee
United States of America

2

OPINION OF THE COURT

BECKER, Chief Judge.

These appeals by defendants Anthony Morelli and Igor Roizman from judgments in a criminal case raise two issues of criminal law and procedure. Morelli's appeal centers on the interpretation of the federal money laundering statute, 18 U.S.C. S 1956, in the context of wire fraud. Roizman's appeal involves the question of ineffective assistance of counsel where the defendant's attorney faces a possible conflict of interest.

The scheme in which Morelli and Roizman were involved engaged in a series of transactions that resulted in the embezzlement of excise taxes from fuel sales. Each series included a number of wire transfers, each of which occurred after the money involved came into the possession of those who controlled the scheme. At trial, the government proved only that specific transfers had occurred before the point at which the taxes should have been collected for transmittal to the government. Morelli argues that these series of transactions did not constitute money laundering.

He claims initially that the government failed to prove that any of the transactions involved proceeds of fraud, since the government offered no proof of wire transfers occurring after the point at which the taxes should have been collected. He contends that the money did not become the proceeds of fraud until after it should have been collected for the government but was not. We reject this conclusion because we believe that the money became the proceeds of fraud as soon as it entered the hands of members of the scheme. Alternatively, Morelli submits that the money was not the proceeds of wire fraud because the money came into the possession of the scheme as a result of fraud before any of the wirings involving the money occurred. But he ignores the fact that the scheme succeeded as a result of each and every wiring within each and every series of transactions. Accordingly, the money within each series of transactions was the proceeds of wire

3

fraud because the fraud from which it resulted was promoted by the wire transfers within the preceding series of transactions.

Morelli also contends that the District Court erred in not granting him a downward departure from the money laundering guideline, U.S.S.G. S 2S1.1, because his conduct did not fall within the "heartland" of money laundering. We disagree, and dispose of this contention summarily in note 13 infra.

Roizman's appeal alleges that his attorney provided inadequate assistance because of a conflict of interest. Roizman's attorney represented both him and an individual whose statements were introduced at trial as hearsay evidence against him. Roizman first argues that his lawyer's conduct was deficient since he faced an actual conflict of interest to the extent that his ability to impeach the witness's hearsay statements conflicted with his duties to the witness as his client. The District Court rejected this claim because it found that impeachment of the witness was not a "plausible alternative defense strategy" for Roizman. Because we agree with the District Court's conclusion, and because such impeachment would not have adversely affected the witness's interests, we reject Roizman's argument.

Roizman also contends that his conviction should be reversed on a potential conflict-of-interest theory. He claims that the prosecutor, as well as his own attorney, knew of the conflict his attorney faced and, thus, violated his constitutional rights by not bringing it to the attention of the District Court. We can only grant a reversal for a potential conflict of interest, however, if the District Court itself was or should have been aware of the conflict and failed to address it. Since Roizman does not contend that the District Court should have been aware of the conflict, we reject his claim. We will therefore affirm the judgments of the District Court.

I. Procedural History

Morelli, Roizman and a number of coconspirators participated in a "daisy chain" scheme to evade excise taxes

on the sale of certain kinds of fuel. The elements of such schemes have been detailed sufficiently elsewhere. See, e.g., United States v. Sertich, 95 F.3d 520, 522 (7th Cir. 1996), cert. denied, 519 U.S. 1113 (1997); United States v. Veksler, 62 F.3d 544, 547 (3d Cir. 1995); United States v. Macchia, 35 F.3d 662, 665-66 (2d Cir. 1994); United States v. Victoria-21, 3 F.3d 571, 573 (2d Cir. 1993); In re Assets of Martin, 1 F.3d 1351, 1353 (3d Cir. 1993); United States v. Tarricone, 996 F.2d 1414, 1416-17 (2d Cir. 1993); United States v. Aracri, 968 F.2d 1512, 1514-17 (2d Cir. 1992); United States v. Musacchia, 900 F.2d 493, 495-96 (2d Cir. 1990), vacated, 955 F.2d 3 (2d Cir. 1991). We will set forth any relevant facts in our discussion of particular substantive issues.

As a result of their activities, Morelli and Roizman were charged in a forty four-count indictment, tried, and convicted of some of the counts. Several other coconspirators pleaded guilty at different times. Morelli was convicted of a RICO conspiracy, racketeering, an extortion conspiracy, extortion, mail fraud, and general conspiracy. With respect to the RICO conspiracy, the jury found that the government had proven money laundering as one of many predicate acts. With respect to the general conspiracy conviction, the jury found that one of the objects of the conspiracy, among others, was money laundering. Morelli was not named in any of the racketeering acts alleging money laundering. However, he was sentenced under the money laundering guideline, which provided the highest offense level. He received a three-point enhancement because he acted as a manager or supervisor of the money laundering conspiracy. The District Court then departed downward three levels, finding that the value of the funds laundered detailed in the Presentence Investigation Report overrepresented the crime. Morelli was sentenced to 240 months in prison. Roizman was convicted of RICO conspiracy, mail fraud, and extortion, and was sentenced to 90 months in prison. These timely appeals followed. 1

_____

1. The District Court properly exercised jurisdiction over the matter under 18 U.S.C. S 3231. We exercise appellate jurisdiction over the final judgment of the District Court under 18 U.S.C. S 3742 and 28 U.S.C. S 1291.

In addition to the arguments outlined in the introduction, the defendants each make a number of arguments that are patently without merit; hence we identify them and dispose of them summarily in the margin. Morelli contends that the District Court erred in applying his Role in the Offense adjustment to all of his offense groupings for sentencing purposes.[2] He also claims that he should not have been convicted of RICO conspiracy because he did not commit or agree to commit two predicate acts.[3] Finally, Morelli insists that his Sixth Amendment right to counsel was violated because two cooperating witnesses, Dougherty and Zummo, had previously participated in a joint defense agreement.[4] Roizman adopts by reference those of Morelli's claims that are relevant to him.[5]

Following the initial oral argument in this case in June of 1997, we placed it in abeyance pending the Supreme Court's decision in Salinas v. United States, 522 U.S. 52

_____

2. Morelli submits that the Sentencing GuidelineS 3B1.1 enhancement for "Role in the Offense" should have been applied only to the extortion group of crimes, and not the money laundering or fraud groups. The District Court concluded otherwise, and we see no error in its conclusion. The evidence supports the conclusion that Morelli was a "supervisor or manager" with respect to the fraud and money laundering, as well as the extortion.

3. Morelli's appeal on this point rested on his argument that we should reverse our decision in United States v. Adams, 759 F.2d 1099 (3d Cir. 1985). However, the Supreme Court has held that our conclusion in Adams was correct. See Salinas v. United States, 522 U.S. 52 (1997).

4. The District Court found no such violation of Morelli's Sixth Amendment rights. United States v. Morelli, Opinion & Order, Crim. No. 93–210 (D.N.J. Jan. 26, 1998). It concluded that"[t]here was no evidence that either Dougherty or Zummo revealed any confidential defense strategy or any other prejudicial information to the Government." Slip op. at 7. We see no clear error in its finding, and accordingly affirm its conclusion that Morelli's Sixth Amendment rights were not violated. Morelli also argued that the government should have been directed to produce its notes of its meetings with Dougherty and Zummo for Morelli's inspection. Based on our in camera inspection of these notes we agree with the District Court that they contained no information pertinent to his claim.

5. Since we affirm the District Court's conclusions on all points, we need not determine precisely which of Morelli's arguments Roizman adopts.

(1997). See supra note 3; see also United States v. Morelli, Order, Nos. 96-5144 & 96-5389 (3d Cir. June 23, 1997). In the meantime, we remanded certain issues to the District Court for further factual findings. The Supreme Court has now decided Salinas, see supra note 3, and the District Court has certified its findings on the issues to which we directed its attention, see supra note 4 & infra Part III. Accordingly, the appeal is now ripe for decision.

II. Morelli's Appeal

A. Preservation of Issue for Review

We first take up Morelli's argument that the District Court erred in calculating his sentence based primarily on the money laundering guideline, U.S.S.G. S 2S1.1. He contends that, as a matter of law, the facts do not support the conclusion that money laundering occurred. Although Morelli frames this submission as a challenge to his sentence, it is in actuality a sufficiency of the evidence argument. Morelli did not raise this in a Rule 29 motion, which would ordinarily be required of a sufficiency claim. See United States v. Powell, 113 F.3d 464, 466-67 (3d Cir. 1997) ("If a defendant fails to file a timely motion for judgment of acquittal, we review sufficiency of evidence for plain error." (citing United States v. Gaydos, 108 F.3d 505, 509 (3d Cir.1997))), cert. denied, 118 S. Ct. 454 (1997). Nevertheless we find that it is properly before us on the conventional direct appeal standard of review because of the unusual procedural posture, i.e., that this issue is only relevant for sentencing purposes.

Morelli was convicted of a multiple-object general conspiracy and a RICO conspiracy with numerous predicate acts. The jury found that these conspiracies had objects or predicate acts other than money laundering that Morelli does not challenge on appeal. Thus, even if he presented a successful challenge to the money laundering allegations, we would not reverse Morelli's conviction on the conspiracy count because, as he concedes, he was involved in a criminal conspiracy, albeit one to commit mail and wire fraud and extortion. See Griffin v. United States, 502 U.S.

7

46 (1991); United States v. Conley (Conley II), 92 F.3d 157, 163 (3d Cir. 1996) ("It is clear that when a jury returns a general verdict of guilty on a multi-object conspiracy count, the conviction will stand over Fifth Amendment due process objections so long as there is sufficient evidence to support any one of the objects of the conspiracy."), cert. denied, 520 U.S. 1115 (1997). Likewise, he cannot challenge his RICO conspiracy conviction, as he concedes numerous predicate acts, including those same crimes, which are sufficient to support the conviction. See United States v. Vastola, 989 F.2d 1318, 1330 (3d Cir. 1993) (applying the reasoning of Griffin and concluding that the dismissal of one predicate act did not require reversal of a racketeering conviction where a sufficient number of other predicate acts on which the jury's verdict could have rested remained).

Furthermore, determining the objects of a conspiracy and the predicate acts of a RICO conspiracy for sentencing purposes is the duty of the trial judge, not the jury. See Conley II, 92 F.3d at 169 ("[T]he district court's determination of the object of the conspiracy is wholly independent of the jury's determination of the object of the conspiracy."). Since this decision on the part of the District Court is not bound up with the jury's verdict, it need not be challenged in a Rule 29 motion for acquittal notwithstanding the jury's verdict.6 Rather, a defendant need only challenge the district court's findings as to the objects of the conspiracy and the RICO predicate acts at sentencing in order to preserve the issue for review. Because Morelli raised his present claim in his sentencing hearing, we conclude that it is appropriately before us. "When [as here] the essential facts are not in dispute, our review of the district court's interpretation of the Guidelines, like our review of a statute's interpretation, is plenary." United States v. Bogusz, 43 F.3d 82, 85 (3d Cir. 1994) (citing United States v. Rosen, 896 F.2d 789, 790-91 (3d Cir.1990)).

---

6. Unlike the verdict in Conley II, the jury in this case returned a special
verdict concerning the objects of the conspiracy and the predicate acts of the RICO conspiracy. Accordingly, the District Court's conclusion that money laundering occurred is buttressed by the jury's special verdicts to similar effect.

B. Money Laundering -- Facts and Legal Background

Because the facts of this case are somewhat complicated, we will briefly review those revolving around the alleged money laundering. The particular scheme in which the defendants participated was termed "the Association." The Association organized a group of companies, all of which it controlled, into a "daisy chain," for the purpose of embezzling the excise taxes on the sale of certain kinds of fuel. Typically, the companies would sell oil down the chain in a series of paper transactions, through what was referred to as the "burn company." Eventually, the company at the bottom of the chain, the "street company," would sell the oil to a legitimate retailer, i.e., a particular gas station, for a price slightly below the tax-included market price. This retailer would pay money to the street company, which would send money back up the chain in a series of wire transfers.[7]

This scheme was illegal because it was set up as a means to avoid excise taxes. The daisy chain was established so that the burn company was the one legally responsible for collecting the excise taxes on the fuel sales and transmitting them to the government. In the Association's scheme, the burn company would collect the taxes for a time, and then disappear without ever paying the taxes to the government. As a result, the Association could keep the money representing the excise taxes without the government being able to determine where it had gone. The indictment charged, and the jury found, that this conduct constituted both wire fraud and money laundering. It charged the first wire transfer, from the street company to the next company above it in the chain, as wire fraud. It charged the second and subsequent wire transfers as money laundering.

_____

7. The money was not always wired back up the chain via each individual company. Occasionally, a wire transfer would skip some companies. In addition, the wire transfers apparently almost always skipped the burn company. As the discussion below demonstrates, however, these details need not concern us, because it is sufficient that the money was wired at least once.

The money laundering statute, 18 U.S.C. S 1956(a)(1), provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity -- (A)(i) with the intent to promote the carrying on of specified unlawful activity; or . . . (B) knowing that the transaction is designed in whole or in part -- (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . [is guilty of money laundering].

The statute, in pertinent part, sets forth four elements of the crime: (1) an actual or attempted financial transaction (2) involving the proceeds of specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) either (a) an intent to promote the carrying on of specified unlawful activity, or (b) knowledge that the transaction is designed to promote the underlying specified unlawful activity or "to conceal or disguise the nature [or] the source . . . of the proceeds of specified unlawful activity." 18 U.S.C. S 1956(a)(1). Morelli does not contest the first and third elements. He also does not contest the intent element of money laundering.[8]

The term "specified unlawful activity" is defined, in pertinent part, by reference to those acts that constitute "racketeering acts" under RICO. See 18 U.S.C. S 1956(c)(7)(A) ("[T]he term `specified unlawful activity' means any act or activity constituting an offense listed in section 1961(1) of this title . . . ."). Under S 1961(1), wire

_____

8. He does complain, however, that it is unfair for the government to charge both promotion and concealment with respect to the same transactions. See United States v. Paramo, 998 F.2d 1212, 1218 (3d Cir. 1993) (noting that another court has observed that "conduct punishable [as concealment] typically would not also be punishable [as promotion, and vice versa]"). We have noted, however, that these two motivations are not necessarily inconsistent, as "a finding of guilt [for concealment] is not a defense to a prosecution [for promotion]." 998 F.2d at 1218 n.3.

fraud is a "specified unlawful activity," but tax fraud simpliciter is not. See 18 U.S.C. S 1961(1)(B).

We have interpreted the money laundering statute several times. See, e.g., United States v. Conley (Conley I), 37 F.3d 970 (3d Cir. 1994); United States v. Paramo, 998 F.2d 1212 (3d Cir. 1993). Paramo focused solely on the fourth element of the statute -- whether the defendant's actions constituted sufficient evidence of the appropriate intent. See 998 F.2d at 1216-18. In Conley I, we focused both on this intent element and on the second element -- whether the funds at issue were the "proceeds of a specified unlawful activity." 37 F.3d at 977-81. Whether certain money constitutes "proceeds of specified unlawful activity" is the sole contested question presented in this case.

In Conley I, we held that "[a]lthough the money laundering statute does not define when money becomes `proceeds,' it is obvious to us that proceeds are derived from an already completed offense, or a completed phase of an ongoing offense . . . ." 37 F.3d at 980. This is true even if the money laundering transaction can also be considered a part of the continuing specified unlawful activity. In Conley I, the defendant was charged with conspiracy to conduct an illegal gambling business and to commit money laundering. The conspiracy revolved around the distribution and use of illegal video poker machines. The money laundering aspect of the scheme derived from the retrieval and distribution of the money deposited in the machines. We concluded that, since the distribution and use of the machines alone constituted an illegal gambling business, the specified unlawful activity had been completed at the time the conspiracy's activities resulted in proceeds. Accordingly, the money retrieved from the machines was proceeds of the illegal gambling business, even though the retrieval of the money was also chargeable as part of the crime of conducting the business. See 37 F.3d at 980.

This case forces us to decide the question we partially (and tangentially) addressed in Conley I: whether the funds involved in the alleged money laundering transaction were "proceeds of specified unlawful activity." Morelli makes two arguments. First, he contends that the money did not become proceeds until after it passed through the burn

11

company. He alleges that this is significant because the government offered no evidence as to how much money was wired after it passed through the burn company, thus failing to prove that money laundering occurred. In the alternative, he claims that, if the money became proceeds before it passed through the burn company, it did so as soon as it came into the Association's control. Thus, it cannot have been the proceeds of wire fraud, since the wire fraud was predicated on the money being wired after it entered the control of the Association. We address these points in turn.

C. Did the Transactions Involve the Proceeds
       of the Fraud?

The government only proved financial transactions, i.e., wirings of money up the daisy chain, occurring before the money reached the burn company. Accordingly, if the money did not become proceeds until after it passed through the burn company, as Morelli contends, the government's proof of money laundering would have failed because it would not have proved a financial transaction involving proceeds.

Morelli argues that the money did not become proceeds until it moved past the burn company. In essence, he contends that since the duty to pay the taxes lay with the burn company, no fraud occurred until the burn company itself failed to collect and pay the taxes. Hence, before the burn company failed to do so, the money was entirely legitimate. But the taxes were not, as Morelli claims, collected and passed on, and then diverted. They were never collected. The paperwork that indicated that the taxes had been collected was falsified. The transactions going down the chain —-purporting to represent sales of fuel -— were fraudulent, and the payments going back up the chain were proceeds of that fraud.

In our view, the key point is that the entire chain of companies was operated by the Association; it was all part of the conspiracy. Once the money entered the control of the street company, it entered the control of the Association. The Association never had any intention of

paying the taxes. It organized the chain precisely to avoid having to do so. Although in a paperwork sense the taxes were not embezzled until they passed the burn company, the reality is that the taxes were embezzled as soon as the funds entered the chain. The fact that the Association organized the daisy chain to make it appear that distinct companies were buying and selling the gas and that the tax was collected at each step prior to the burn company does not alter our conclusion. We conclude that the fraud was completed when the money entered the control of the Association acting through the street company, since at that time it had no present intent to pay the taxes. Under these circumstances, the taxing authorities were defrauded out of their funds at the time the money entered the chain.

In sum, we find no reason to set aside the judge's and jury's implicit conclusion that the money derived from this scheme became proceeds for the Association as soon as it entered the street company's hands. Legally, the money was the proceeds of fraud as soon as it entered the hands of the street company.

D. Was the Money the Proceeds of Wire Fraud?

We also think that the money was the proceeds of wire fraud, and not simply tax fraud, which is not a specified RICO predicate act and therefore not a specified unlawful activity under S 1956. Morelli contends that, even if the money became proceeds of some illegal activity at the time it came into the possession of the street company, it was only the proceeds of tax fraud. He argues that, at the time the money entered the hands of the street company, no wire fraud had occurred. Before it was wired, he says, the money was the proceeds of tax fraud. After it was wired, the argument continues, although a wire fraud may have been committed, the money was not the proceeds of a wire fraud, because the wiring itself had nothing to do with the Association's coming into possession of the money.

As an initial matter, we think that Morelli would be correct that the the money would not be the proceeds of wire fraud if only one of these daisy chain series of transactions had occurred. Proceeds are "[t]hat which

13

results, proceeds, or accrues from some possession or transaction." Black's Law Dictionary 1204 (6th ed. 1990). The transaction series in question here is the single series of wirings of the funds from the street company up the chain through the burn company to the top. We think it is obvious that the money that the Association fraudulently obtained does not "result, proceed, or accrue" from this single series of wirings, and therefore the money is not the proceeds of wire fraud. Within the individual series of transactions, the money is the proceeds of fraud simpliciter at the time it enters the Association's hands. The later wirings do not change its character into the proceeds of wire fraud.9

_____

9. Accordingly, we disagree with the opinion of the Seventh Circuit in United States v. Mankarious, 151 F.3d 694 (7th Cir.), cert. denied, 119 S. Ct. 621 (1998). That court, relying on inter alia Schmuck v. United States, 489 U.S. 705 (1989), concluded that, unlike bank and wire fraud, "[a] mail fraud scheme . . . can create proceeds long before the mailing ever takes place." 151 F.3d at 705. We think that that court misreads Schmuck. In Schmuck, the defendant created an ongoing fraudulent scheme that involved a group of independent series of fraudulent transactions. Each of these series ended with a mailing, which the Supreme Court held could provide a basis for mail fraud convictions. The Seventh Circuit apparently reads Schmuck as meaning that the mailings rendered the individual series of transactions with which they were associated mail fraud nunc pro tunc.

We disagree. As discussed in more detail below, the key in Schmuck was not that the mailings increased the likelihood of success of the individual fraudulent series of transactions. Rather, each individual mailing contributed to the future success of the entire scheme. See 489 U.S. at 711–12 (although the mailings may not have contributed to the success of the individual already-completed series of transactions, they were "essential to the perpetuation of Schmuck's scheme"). Thus, we think that Schmuck does not support the Seventh Circuit's understanding of the term "proceeds" in the money laundering statute.

We also note that the court in Mankarious drew a false distinction between wire and mail fraud. See Mankarious, 151 F.3d at 705. As we have noted, the wire fraud and mail fraud statutes differ only in form, not in substance, and cases such as Schmuck interpreting one govern the other as well. See United States v. Frey, 42 F.3d 795, 797 & n.2 (3d Cir. 1994) (citing United States v. Tarnopol, 561 F.2d 466, 475 (3d Cir. 1977) ("[T]he cases interpreting the mail fraud statute are applicable to

14

This does not get Morelli off the hook, however. We believe that the money wired up from the street company was, in fact, the proceeds of wire fraud, just not in the way Morelli thinks it might have been. In order to understand this, we must engage in a close reading of the wire fraud statute, which reads as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned for not more than five years, or both.

18 U.S.C. S 1343. Wire fraud consists of (1) a scheme to defraud and (2) a use of a wire transmission for the purpose of executing, or attempting to execute, the scheme. See Frey, 42 F.3d at 797. Morelli concedes that the daisy chain was a scheme to defraud. Furthermore, as discussed above, the scheme produced proceeds. The question is, was the scheme a wire fraud scheme in such a way that its proceeds were the proceeds of wire fraud at the time the Association conducted a financial transaction involving them?

_____

the wire fraud statute as well.")). Thus, the Seventh Circuit's conclusion would -- if correct -- apply equally to cases involving wire fraud.

Finally, we observe that none of this implies that Morelli did not conspire to commit wire fraud. A wiring could constitute wire fraud even though it involved money that had already been obtained as a result of fraud. See United States v. Allen, 76 F.3d 1348, 1362 (5th Cir. 1996) (holding that "acts occurring after the defrauding defendant already controls the proceeds of the fraud may . . . further the fraud" and accordingly constitute wire fraud); cf. Schmuck, 489 U.S. at 712 (holding that mail fraud occurs so long as the mailing is "incident to an essential part of the scheme" (internal quotations omitted)). Clearly, the wirings in this case were "incident to an essential part of the scheme," the transmittal of the money in a useable form to the members of the Association.

15

We think the money was the proceeds of the entire ongoing fraudulent venture in which the Association engaged in creating the daisy chain scheme, and that this venture was a wire fraud scheme. This ongoing venture consisted of all the individual series of transactions upon which Morelli focuses, not the discrete series of transactions individually. Although each series may have included discrete acts of wire fraud that followed the creation of the proceeds related to that series, the fact is that the entire program, encompassing all of the acts charged in the indictment, constituted one large, ongoing wire fraud scheme. Each wiring in each series furthered the execution of each and every individual act of tax fraud, and helped to create the proceeds involved in each succeeding series of transactions. This is primarily because each wiring, whether it occurred before or after a given act of tax fraud, served to promote and conceal each individual embezzlement of taxes, either ex ante or ex post. More precisely, each wiring, including those that occurred before a particular transaction, made it more difficult for the government to detect the entire fraudulent scheme or any particular fraudulent transaction or series of transactions. In sum, the money gained in each series of transactions (save the initial one) was the proceeds of wire fraud because the money was the proceeds of a fraud that was furthered by the prior wirings.10

This case is similar to Schmuck v. United States, 489 U.S. 705 (1989). In Schmuck, the Supreme Court upheld the defendant's conviction for mail fraud. The defendant had

_____

10. We note that this means that the funds acquired in the first series of transactions were not the proceeds of wire fraud. This is immaterial, however, since the first series, as noted above, would still constitute wire
fraud, and the aggregate amount of proceeds would not be reduced significantly enough to reduce Morelli's sentence. No individual series of transactions involved more than a few hundred thousand dollars, whereas the ongoing scheme involved tens of millions of dollars. The largest single wire transfer listed in the indictment was for $780,000. Subtracting this amount from the total amount upon which Morelli's sentence was based would not change the specific offense characteristic category for the amount laundered. See U.S.S.G. S 2S1.1(b)(2). Accordingly, any error in including the funds from the first series of transactions was harmless.

16

created a scheme in which he would roll back the odometers on cars and sell them as new to car dealers. As with any car sale, each unwitting dealer would mail a title-application form to the state government. The Court concluded that this mailing was sufficient to support a mail fraud conviction. In particular, the Court found that:

> Schmuck's was not a "one-shot" operation in which he sold a single car to an isolated dealer. His was an ongoing fraudulent venture. A rational jury could have concluded that the success of Schmuck's venture depended upon his continued harmonious relationship with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from the dealers to their Wisconsin customers.
>
> Under these circumstances, we believe that a rational jury could have found that the title-registration mailings were part of the execution of the fraudulent scheme . . . . [A]lthough the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme.

489 U.S. at 711-12. In Schmuck, the Court recognized that, even though each individual fraudulent transaction series involved a mailing only after the fraud had already been completed, each mailing contributed to the entire scheme and made each other individual fraudulent transaction series, particularly those occurring later, more likely to be successful.11

_____

11. We recently distinguished Schmuck, although not in a way that is relevant here. In United States v. Cross, 128 F.3d 145 (3d Cir. 1997), cert. denied, 118 S. Ct. 1519 (1998), we reversed mail fraud convictions based on the fact that, although the mailing at issue aided the success of the fraud, the mailing would have occurred whether the fraud had taken place or not. The alleged fraud involved fixing traffic court cases. The mailings at issue were the routine transmissions of case dispositions to the parties. We distinguished Schmuck on the ground that "the court regularly mailed notices to parties and the DOT in every case, whether or not the defendants had attempted to influence the result." 128 F.3d at 152 n.4. There was no causal nexus between the fraud and the mailings in Cross. Here, by contrast, the wirings, like the mailings in Schmuck, would not have been made but for the existence of the fraudulent scheme. Morelli's case is much more like Schmuck than Cross.

17

This case is controlled by Schmuck. Each wiring concealed and promoted each and every fraudulent series of transactions by making the entire scheme less detectable. Without the wirings to make it appear as if a series of distinct transactions between independent companies had occurred, the taxing authorities would have had a much easier time tracking down the perpetrators of the tax fraud scheme. Each wiring "was essential to the perpetuation of [the Association]'s scheme." Schmuck, 489 U.S. at 712. Since each individual fraudulent series of transactions other than the initial one was preceded by a wiring that promoted it, we think that, within each transaction series, the money was the proceeds of wire fraud at the time it came into the hands of the Association in the form of the street company. As soon as one wiring took place, the entire tax fraud scheme became a wire fraud scheme. Since the very first series of transactions involved a wiring of the funds, every fraudulent acquisition of funds thereafter was an acquisition of funds through wire fraud.

This conclusion is entirely consistent with Conley I. See 37 F.3d at 980 (requiring that proceeds be "derived from an already completed offense, or a completed phase of an ongoing offense"). The entire daisy chain was an ongoing fraudulent venture. Each series of transactions within it was a "completed phase" of the ongoing scheme. As we discussed above, the phases were completed as soon as one wiring occurred as part of the entire venture and the money from the individual series of transactions came into the possession of the street company aspect of the Association.

Morelli's case also resembles United States v. Massey, 48 F.3d 1560 (10th Cir. 1995). In Massey, the defendants convinced a number of people to invest in their fraudulent loan scheme. When some of the participants became concerned that they had not received their loans, the defendants sent them letters encouraging them not to withdraw their money. Later, one of the defendants wired some of the money to another defendant. The defendants were convicted of mail fraud and money laundering. See 48 F.3d at 1565. The defendants claimed that none of the money involved in the wiring came from victims who received the mailings. Accordingly, the defendants argued

18

that the money wired could not have been the proceeds of mail fraud.

The court of appeals upheld the conviction. While noting that the defendants' assessment of the facts was correct, as far as it went, it observed that at least two mailings had been sent to victims prior to the wiring, albeit not to victims whose money was transferred in the wiring. See 48 F.3d at 1566. The court concluded that these mailings not only contributed to the success of the fraud with respect to the victims who received them but also to the overall success of the entire fraudulent loan program. See 48 F.3d at 1567 ("[T]he letters protected the plan to defraud all of the victims and not just the victim to whom the letter was sent."). In particular, if the letters had not been sent to the other victims, the fraud with respect to the victims whose money was wire transferred might not have been successful. See 48 F.3d at 1566-67. Accordingly,

> the jury could reasonably find that the fees deposited in the bank account from which the wire transfer was sent were derived from the fraudulent scheme that was furthered by the lulling letters. The "proceeds" of mail fraud are derived from the success of a fraudulent scheme that has been facilitated through the use of the mails. . . . Accordingly, we conclude that the jury had sufficient evidence to conclude that the government met all of the elements of money laundering . . . .

48 F.3d at 1567 (citations omitted).

We find Massey persuasive. Moreover, Morelli's case is indistinguishable from Massey. Had some or all of the wirings not occurred, some of the daisy chain transaction series might have been detected by the taxing authorities and the entire scheme would have been discovered sooner. Each of the wirings made before each individual fraudulent series of transactions contributed to the success of those transactions. As in Massey, the money resulting from these transactions was the proceeds of wire fraud at the time of the wire transfers. Accordingly, we conclude that the jury and the District Court had sufficient evidence to conclude that the government met all of the elements of money laundering under S 1956.12 Therefore, we think the District

_____

12. Both parties in this case cite a number of other cases that they believe are relevant to the issue before us. See, e.g., United States v.

19

Court properly sentenced Morelli under the money
laundering guideline.[13]

_____

Christo, 129 F.3d 578 (11th Cir. 1997); United States v. Allen, 76 F.3d
1348 (5th Cir. 1996); United States v. Savage, 67 F.3d 1435 (9th Cir.
1995); United States v. Kennedy, 64 F.3d 1465 (10th Cir. 1995); United
States v. Johnson, 971 F.2d 562 (10th Cir. 1992). We do not believe
these cases aid us in deciding the issue before us. They all involved the
temporal question whether, at the time the alleged money laundering
transaction occurred, the money involved in the transaction was
proceeds. See, e.g., Allen, 76 F.3d at 1362 ("In this case, the consultant
fees and loans left the control of First City Bank and reached the
accounts of the conspirators before the wire transfers occurred. The
charged transactions distributed the proceeds among the various
defendants and helped hide the fraud from First City auditors and
federal regulators."); Kennedy, 64 F.3d at 1478 ("[T]he illegal mailings
in
this case involved discrete, earlier mailings by Kennedy, rather than the
receipt of funds by Kennedy from his victims. It was the subsequent and
distinct transfers of funds that were alleged as the separate transactions
involving `proceeds of specified unlawful activity' which constituted the
alleged money laundering under S 1956."). This is the question we
addressed in Conley I, 37 F.3d at 980 (proceeds must be "derived from
an already completed offense, or a completed phase of an ongoing
offense"). The question before us today, on the other hand, is the more
abstract question whether the money was the proceeds of wire fraud.
These cases do not help us answer that question.

13. Morelli also contends that the District Court erred in failing to
grant
him a downward departure because, even if the conspiracy involved
money laundering, it was not within the "heartland" of money
laundering. He relies on proposed amendments to the money laundering
guidelines, which Congress rejected in 1995, that would have tied money
laundering sentences to the offense level of the underlying specified
unlawful activity. He also contends that he is entitled to a downward
departure because the government charged him, unlike others who
engaged in similar schemes but were prosecuted separately, with money
laundering. Morelli claims that this constitutes unfair sentence
manipulation.

The District Court did grant Morelli a downward departure on the
ground that the "value of the funds" adjustment under U.S.S.G.
S 2S1.1(b)(2) overstated the seriousness of the money laundering that
occurred. See United States v. Morelli, Opinion, Crim. No. 93-210, at 16-
19 (D.N.J. Feb. 26, 1996). If the District Court refused to grant a larger
downward departure in an exercise of its discretion, we have no

20

III. Roizman's Appeal

Roizman argues that his conviction should be reversed because of an actual or potential conflict in his attorney's representation of both him and one Igor Porotsky. Porotsky was neither a codefendant nor a witness at trial, but his statements were admitted as hearsay statements through the testimony of other witnesses. In particular, various witnesses testified that Porotsky had been involved in the fuel business before the Association was created, and that he had been involved with Morelli and other alleged members of the Italian Mafia. At the time of trial, Larry Silverman, who was then Roizman's attorney, was also representing Porotsky in a separate matter.14 Roizman

_____

jurisdiction to consider Morelli's claim. See United States v. Khalil, 132 F.3d 897 (3d Cir. 1997); United States v. Miele, 989 F.2d 659, 668 n.11 (3d Cir. 1993); United States v. Parker, 902 F.2d 221, 222 (3d Cir. 1990). On the other hand, if the sentencing court denied a larger downward departure because it erroneously concluded it lacked legal authority to consider a separate ground for departure, we have jurisdiction to review the sentence. See United States v. Spiropoulos, 976 F.2d 155, 160 n.2 (3d Cir. 1992).

In this case, however, the District Court committed no error. Despite Morelli's repeated and vociferous arguments, proposed amendments to the Sentencing Guidelines do not provide independent legal authority for a downward departure. See United States v. Anderson, 82 F.3d 436 (D.C. Cir. 1996) (explaining persuasively why proposed crack cocaine amendments did not provide independent authority for a downward departure). Furthermore, Morelli's invocation of United States v. Lieberman, 971 F.2d 989, 994-96 (3d Cir. 1992), in which we affirmed a district court's grant of a downward departure for manipulation of the indictment, does not help him since in that case the district court had decided in its discretion that a downward departure was appropriate and the question on appeal was whether the district court had authority to do so. Here, by contrast, the District Court considered both of Morelli's proposed grounds for departure and exercised its discretion to reject them. Accordingly, since Morelli's argument is essentially a challenge to the District Court's exercise of its discretion in denying him an additional downward departure, we have no jurisdiction to consider his claim.

14. We need not consider the much-debated issue of the precise scope of this representation, however, since we conclude that, regardless of the scope of the representation, cross-examining Porotsky was not a useful alternative strategy and, at all events, doing so would not have conflicted with Silverman's duties to Porotsky.

21

argues that, as a result of this representation, Silverman suffered a conflict and was unable to impeach Porotsky as a hearsay declarant adequately. See Fed. R. Evid. 806 (permitting impeachment of the declarant of statements admitted as hearsay). Roizman also contends that, even if this was only a potential conflict, it merits a reversal because counsel for the government should have been aware of it at trial.

After we remanded Roizman's claims to the District Court, the Court heard arguments and considered the documentary evidence. For the reasons set forth infra, the District Court rejected all of Roizman's claims regarding Silverman's representation and alleged conflict of interest. "We apply plenary review to the district court's application of legal precepts, and clearly erroneous review to its factual findings." United States v. Brink, 39 F.3d 419, 421 (3d Cir. 1994) (citations omitted).

A. Actual Conflict of Interest

An actual conflict claim arises after trial upon the discovery of a previously unnoticed conflict of interest on the part of trial counsel. "[A] defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). We have elaborated on this as follows: "An actual conflict of interest `is evidenced if, during the course of the representation, the defendants' interests diverge with respect to a material factual or legal issue or to a course of action.' " United States v. Gambino, 864 F.2d 1064, 1070 (3d Cir. 1988) (quoting Sullivan v. Cuyler, 723 F.2d 1077, 1086 (3d Cir. 1983)). In addition, we have noted that an actual conflict is more likely to be found where "an attorney takes positive steps on behalf of one client prejudicial to another" as opposed to cases where "the attorney's actions are based on inaction and are passive." Gambino, 864 F.2d at 1070.

Similarly, an actual conflict is more likely to occur in cases of joint representation -- representation of more than one defendant at the same trial -- rather than simply multiple representation -- representation of defendants in

22

different trials -- as occurred here. In cases involving multiple but not joint representation, and when an attorney has in some way failed to act, we have adopted the following standard:

> In order to establish an actual conflict the petitioner must show two elements. First, he must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

Gambino, 864 F.2d at 1070 (quoting United States v. Fahey, 769 F.2d 829, 836 (1st Cir. 1985)); see also Hess v. Mazurkiewicz, 135 F.3d 905, 910 (3d Cir. 1998). When an actual conflict with an adverse effect, of the sort described above, is demonstrated, the defendant is entitled to a reversal for inadequate assistance of counsel without demonstrating prejudice. See Strickland v. Washington, 466 U.S. 668, 692 (1984).15

The District Court found no actual conflict in Silverman's representation of both Porotsky and Roizman. In particular, the court found that Silverman's decision not to attempt to impeach Porotsky was a reasonable strategic decision:

> In this case, it is abundantly clear from an examination of Mr. Roizman's claim in the larger context of the trial that cross-examination of Mr. Porotsky was not a plausible defense strategy that "possessed sufficient substance" to raise a claim of constitutional dimension. . . .
>
> The Court's observations during the lengthy trial confirm that Mr. Roizman's attorney pursued a "wallflower" defense -- that is, that Mr. Roizman was

_____

15. Of course, if the defendant cannot prevail on an actual conflict theory, the defendant can still bring a conventional ineffective assistance claim under Strickland, but the defendant must then show prejudice. See Hess, 135 F.3d at 910.

23

an innocent operator who was a victim of intimidation from other organized crime figures. To have vigorously cross-examined Porotsky, a witness whose hearsay testimony was cumulative and peripheral, and to therefore have risked creating in the jurors' minds a connection between Porotsky and Roizman, would have been asinine in light of the strategy Mr. Roizman pursued. The Court, drawing on its observation of the strategy employed during the trial, as well as Mr. Silverman's affidavit submitted herewith, concludes that the decision not to cross-examine Mr. Porotsky's hearsay statements was not tainted by a conflict of interest. Rather, it was a sound decision, based on an experienced trial lawyer's strategic considerations.

United States v. Morelli, Opinion & Order, Crim. No. 93-210, at 7-8 (D.N.J. Oct. 16, 1997). As the District Court also noted, this strategy was quite successful: "Of the eighteen counts in the indictment against Mr. Roizman, he was acquitted of 13, including the global conspiracy charge." Id. at 7 n.5.

Roizman alleges that Porotsky's hearsay statements incriminated him in several ways. The District Court rejected this argument, finding that impeaching Porotsky would have made Roizman's "wallflower defense" less successful. See id. at 7. It also concluded that Porotsky's statements were "so cumulative and peripheral" that impeaching them would have at best made no difference. Based on our review of the record, we find that the District Court's conclusions were probably correct, and certainly not clearly erroneous. Based on these facts, we agree with the District Court's conclusion that cross-examination of Porotsky was not an alternative strategy with "sufficient substance to be a viable alternative." Gambino, 864 F.2d at 1070.

Even if we were to conclude that the District Court did clearly err in its conclusions on the previous point, we would still affirm its rejection of Roizman's claim. We do not believe that the alleged alternative strategy of impeaching Porotsky created a conflict between Silverman's duties to Roizman and Porotsky. The key point, and one only recognized in Gambino as far as we can tell, is that we

24

must look at the attorney's duties to both clients. An actual conflict exists only if the proposed alternative strategy (a) could benefit the instant defendant and (b) would violate the attorney's duties to the other client. See Gambino, 864 F.2d at 1070.

In Gambino, the court rejected the defendant's actual conflict claim because it found that the proposed strategy would not have hurt the attorney's other client. Gambino involved a drug distribution charge. The defendant (Gambino) claimed that his attorney could have argued that another of the attorney's clients, Mazzarra, might have committed the crime with which Gambino was charged. But Mazzarra was not a codefendant, and the proposed argument would not have rendered Mazzarra directly liable to punishment. Furthermore, the information Gambino contended would have supported the strategy came from the government's files. Exposing this evidence at trial would not have given the government any new information that would have made it more likely to charge Mazzarra. The court concluded that no actual conflict existed because "Mazzara would not have been prejudiced if Evseroff [the attorney] had [tried to show he was the source of the heroin] and thus it follows that appellant and Mazzara did not have conflicting interests in Evseroff's performance at trial." Gambino, 864 F.2d at 1071.

We think that this case is analogous to Gambino. Porotsky was not a defendant in Roizman's case. While Porotsky probably would not have wanted to be impeached as a criminal, he had been convicted of various crimes, and numerous other witnesses at trial had discussed his criminal activities. (In fact, the impeachment would have involved almost exclusively the evidence of these convictions.) Furthermore, the evidence Silverman would have used to impeach Porotsky's statements -- including Porotsky's prior convictions and present indictments-- would most likely have come from the government. We do not see how exposing such information, already in the possession of the government, could have harmed Porotsky's interests.16

_____

16. Roizman also suggests that Silverman should have used information he acquired from Porotsky during his representation of him to impeach

B. Potential Conflict of Interest

Roizman also claims that his conviction should be reversed under a potential conflict theory. We reject this claim as well.

When a district court is aware, or should be aware, of a potential conflict of interest on the part of the defendant's attorney, the court must inquire as to whether the defendant is aware of and waives this conflict. See Wheat v. United States, 486 U.S. 153 (1988); Wood v. Georgia, 450 U.S. 261, 272 (1981); United States v. Pungitore, 910 F.2d 1084, 1143 (3d Cir. 1990). Roizman argues that reversal is required not only when the trial court is aware of such a conflict and fails to act but also when the prosecutor and defense attorney are aware of one. Although Roizman cites several cases from courts within the Second Circuit in support of this claim, see, e.g., United States v. Rahman, 861 F. Supp. 266, 278 (S.D.N.Y. 1994), the court of appeals in that circuit has at most only exhorted prosecutors to advise the trial courts when they are aware of conflicts, see United States v. Stantini, 85 F.3d 9, 13 (2d Cir. 1996). See also Cerro v. United States 872 F.2d 780, 787 (7th Cir. 1989) ("We do not disagree with the propriety of such a recommendation under like circumstances, but we conclude that it is not a constitutional requirement. In the present case, the prosecutor was under no constitutional duty to advise the trial court of a potential conflict based on the information available to him."). They have not held, and we do not hold, that a prosecutor's -- or a defense attorney's -- failure in this respect is grounds for reversal. Since Roizman makes no claim that the District Court was or should have been aware of Silverman's potential conflict, he is not entitled to a reversal on these grounds. 17

_____

Porotsky. We reject this contention. If Silverman had not represented Porotsky and thus created the alleged conflict of interest in this case, he would not have had access to this information. Roizman cannot prevail on the argument that his interests were harmed by Silverman's failure to use information he acquired in confidence from Porotsky to impeach Porotsky. Accordingly, we conclude that no actual conflict with Silverman's duties to Porotsky affected his representation of Roizman.

17. Finally, Roizman argues that we should reverse the District Court's decision because it failed to conduct an evidentiary hearing on his

26

For all these reasons, the judgments of the District Court with respect to both Morelli and Roizman will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

claims. Because we conclude that the District Court did not err in rejecting Roizman's claims based on the documentary evidence before it, we see no need for the court to have conducted further evidentiary proceedings.

27