**UNITED STATES of America,
Plaintiff,**

**v.**

**Robert KOSSAK and Anthony
Panaro, Defendants.**

**No. CRIM.A. 02–64–GMS.**

United States District Court,
D. Delaware.

Aug. 1, 2003.

Colm F. Connolly, U.S. Atty., Ricahrd Andrews, Asst. U.S. Atty., Wilmington, DE, for Plaintiff.

Raymond Radulski, Wilmington, DE, for Defendants.

## MEMORANDUM AND ORDER

SLEET, District Judge.

### I. INTRODUCTION

On June 11, 2002, the Grand Jury for the District of Delaware indicted Robert Kossak ("Kossak") and Anthony Panaro ("Panaro") for violations of 18 U.S.C. §§ 2, 371, 1344, and 2314. A three-week jury trial on these charges is scheduled to commence on September 22, 2003.

Presently before the court are Kossak's Motion to Suppress Statements and Derivative Evidence, as well as his Motion to Quash Subpoena, and third-party Fox Rothschild LLP's ("Fox Rothschild") Motion to Quash Subpoena. For the following reasons, the court will deny each of these motions.

### II. BACKGROUND

On or about September 12, 2000, the Federal Bureau of Investigation ("FBI") opened an investigation into the activities of Infinity Mortgage, Inc. ("Infinity") and its principals, Kossak and Panaro. The FBI initiated this investigation after former Infinity clients claimed that they had been defrauded.

In connection with its investigation, the FBI reviewed paperwork from dozens of Infinity-brokered deals. In the course of that review, the FBI learned that Infinity mortgage closing documents indicated that Joseph D. Kulesza, Jr., Esquire ("Kulesza"), a member of the Delaware Bar, acted as the settlement agent for seven or more closings. However, when interviewed, two Infinity clients, John Stout ("Stout") and Anthony Nichols ("Nichols") indicated that no attorney was present at the closings.

During its investigation, the FBI interviewed Kossak on three occasions. Kulesza represented Kossak at each interview.

The first interview took place on January 12, 2001. At the end of that interview, the FBI agent informed Kulesza of the discrepancies between the closing documents and the contradictory witness statement in the Stout case. Kulesza responded that he did not know whether he had been present for Stout's settlement without checking his records. The two subsequent interviews took place on March 29, 2001 and July 25, 2001.[1]

On June 11, 2002, the Grand Jury for the District of Delaware indicted Kossak and Panaro. The Indictment also gave notice of the Government's intent to seek forfeiture of $500,000 in proceeds from the fraudulent scheme alleged in the Indictment.

On July 11, 2002, Kulesza entered his appearance in this matter as Kossak's counsel. On July 29, 2002, Kulesza filed a motion to dismiss the Indictment against Kossak. He also moved to sever Kossak's trial from that of his co-defendant Panaro. The motions were briefed by the parties, and the court heard oral argument on December 2, 2002. The court subsequently denied these motions. Kulesza then filed a motion for reconsideration of the court's order denying the motion to sever. Following briefing, the court denied this motion on January 21, 2003.

On November 26, 2002, First Assistant United States Attorney Richard Andrews ("Andrews") wrote Kulesza a letter noting the issue with the Stout and Nichols files, and the possibility that Kulesza could contradict their expected testimony. Specifically, Andrews wrote "to make sure that your client recognizes that he will not be able to call you as a witness, in the event that your testimony would be helpful to

---

1. At the time of these interviews, Nichols had also been interviewed, and he denied that Kulesza was present at the settlement.

him." Andrew then proposed presenting a waiver of conflict to the court.

On or about January 27, 2003, the Supreme Court of Delaware suspended Kulesza from the practice of law pending investigation of allegations that he improperly disbursed client funds. In its January 27 Order, the Supreme Court also referred the matter to federal and state criminal authorities for further inquiry.

One of the instances of alleged misconduct concerned Kulesza's diversion of $10,000 from a client escrow account as part of a repayment of a $30,000 "loan" he owed to Kossak. According to a statement provided to the Bar disciplinary authorities, Kulesza approached Kossak, and Kossak's business partner Robert Scott, for a $30,000 loan to address a cash shortfall. Kossak loaned Kulesza the money in November 2002. The loan was undocumented.

The "loan" came due almost immediately. On December 12, 2002, Kulesza obtained a $10,000 treasurer's check drawn on funds from a client escrow account and made payable to "National Builders." Kulesza informed the bar disciplinary authorities that this check was part of the repayment to Kossak. He further stated that he had already repaid the balance of $20,000 in cash to Kossak.

Bank records appear to corroborate this statement. On October 28, 2002, Kossak obtained a $30,000 cashier's check. Kulesza deposited this $30,000 check in a Wilmington Trust account on November 4, 2002.

The next day, Kulesza withdrew $1,000 in cash from the Wilmington Trust account. He made similar withdrawals every few days until December 12, 2002. These withdrawals total exactly $20,000—the amount of cash payments Kulesza told bar authorities that he paid to Kossak prior to December 12, 2002. Moreover, the date of the last cash withdrawal coincides with the date of the issue for the National Builders check. Finally, the National Builders check is endorsed in Kossak's handwriting.

In sum, the Government believes that this information indicates that Kulesza obtained a loan from Kossak for $30,000. Kulesza paid that money back almost immediately. Kulesza did not make use of the $30,000 loan for any particular purpose. Indeed, in November, the only activity in the Wilmington Trust account after the November 4 deposit are the cash withdrawals that Kulesza says went to Kossak. In December, the only activity prior to December 12, when the load was repaid, are the remaining cash withdrawals and a mortgage debit.

Kulsesza's own statement and the available records indicate that he did not pay the money back to Kossak in an easily identifiable way. Rather, he paid $10,000 via a check to "National Builders" and the balance to numerous small cash withdrawals, all in a very short time without making any use of the "borrowed" funds. The Government maintains that this information gives rise to the inference that Kossak is hiding proceeds of the crimes alleged in the Indictment by running them through Kulesza's bank accounts, and is, therefore, probative of consciousness of guilt.

The Government also contends that Kulesza received funds from Kossak via another questionable source. On January 24, 2001, a check was drawn on the real estate escrow account of H. James Childerston ("Childerston").[2] This check was deposited in an escrow account operated

---

2. Childerston is an unindicted co-conspirator of the fraudulent scheme alleged in the Indictment. His escrow account was the vehicle for the allegedly improper disbursement of funds from many of the mortgage loans described in the Indictment.

by Kulesza's former law firm. In addition, the check does not appear to be associated with a real estate settlement. The Government argues that this suggests that this check also represents funds that Kossak was concealing.

Based on the above assertions, the Government served a Rule 17 trial subpoena on Kulesza's former law firm, Fox Rothschild. The subpoena seeks financial records including escrow accounts maintained by Fox Rothschild for Kossak or his company, Kossak, Richardson & associates, Ltd. ("KRA") and financial records showing the movement of legal fees paid by Kossak to Kulesza. The Government expects these records to show substantial legal fees paid by Kossak to Kulesza. According to the Government, this information is probative of two things: (1) that Kossak received substantial proceeds from the fraudulent schemes involving Infinity, and (2) to the extent that Kulesza routed legal fees directly or indirectly back to Kossak, this will be further evidence of efforts to hide money, which shows consciousness of guilt.

On May 27, 2003, Fox Rothschild moved to quash the subpoena. On May 28, 2003, Kossak filed his motion to quash and his motion to suppress.

## III. DISCUSSION

### A. Kossak's Motion to Suppress

■ By his motion, Kossak seeks to: (1) suppress statements that FBI Special Agent Wendy B. Brouwer ("Brouwer") obtained from Kossak on January 12, 2001, March 29, 2001, and July 24, 2001 in the presence of his then-attorney Kulesza and (2) financial documents Kossak prepared after January 12, 2001 and supplied to Brouwer. These financial documents include spreadsheets for KRA, CMB Collections ("CMB"), a "Draw Status Report" which documents financial transactions with Panaro and a "Commission Rebate

Report" reflecting monies returned to borrowers. Specifically, Kossak maintains that this information must be suppressed because Kossak and Kulesza had a conflict of interest which the prosecutor did not adequately disclose. For the following reasons, the court must disagree with Kossak's position.

The issue of the import of a prosecutor's knowledge of an attorney-client conflict is ordinarily raised by criminal defendants either in motions to dismiss indictments or in post-conviction appeals or motions. In either circumstance, courts have not imposed a duty on the prosecutor to notify the defendant himself, but rather, they have exhorted the prosecutor to advise the trial judge or defense counsel of the problem. For instance, in the context of an appeal seeking reversal for ineffective assistance of counsel, the Third Circuit rejected a defendant's argument that the prosecutor's failure to advise the trial court of a potential conflict between the defendant and his attorney was of constitutional significance. *See United States v. Morelli,* 169 F.3d 798, 812 (3d Cir.1999).

The Seventh Circuit reached a similar result in *Cerro v. United States:*

> We now address the prosecutor's responsibility. Contrary to [the defendant's] assertions, the prosecutor was under no duty to advise the court of a potential conflict of interest. At best, the prosecutor knew that Corti implicated [the lawyer] in his grand jury testimony. Those allegations were unsubstantiated and uncorroborated. The prosecutor was in a position to know what the government intended to do with this incriminating information. As the government had not indicted [the lawyer] or made him the object of an investigation, it is likely that the prosecutor did not foresee a potential conflict based on this infor-

mation.... In the present case, the prosecutor was under no constitutional duty to advise the trial court of a potential conflict based on the information available to him.

872 F.2d 780, 787 (7th Cir.1989).

As in the *Cerro* case, while the Government possessed information concerning potential misconduct by Kulesza, Kossak has not demonstrated that, at the time of the interviews in question, the Government possessed evidence sufficient to establish that Kulesza had committed any crime. Moreover, the commentary to the then-applicable Delaware Rules of Professional Conduct ("DRPC") states that prosecutors should act with "caution" when calling attention to a conflict between the defense attorney and the defendant to avoid possible charges of harassment.[3] *See* Pre–July 1, 2003 DRPC Rule 1.7, comment.

Moreover, the record reflects that Brouwer notified Kulesza of the discrepancies on January 12, 2001, the date of Kossak's first interview. Furthermore, as additional evidence came to light, on November 26, 2002, Andrews wrote Kulesza a letter noting the issue with the Stout and Nichols files and the possibility that Kulesza could contradict their testimony. He further proposed presenting a waiver of conflict to the court. In light of these disclosures, the Government is entitled to presume that Kulesza would act in an ethical manner in dealing with any perceived conflicts. *See e.g., Burger v. Kemp,* 483 U.S. 776, 784, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (stating that, "we generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client."). To the extent that Kulesza then breached his ethical obligation to advise Kossak of any conflicts, the Govern-

ment cannot be held accountable for his failures.

Further, although Kossak intimates that the Government is at fault for not contacting him directly, it is clear that Rule 4.2 of the DRPC requires that "a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the lawyer, or is authorized by law to do so." Kossak urges the court to conclude that any communications between himself and the Government would not have been "about the subject of the representation." However, advising a represented individual that his lawyer may have a *direct conflict of interest* is clearly within the scope of the representation.

■ Alternatively, Kossak argues that the Government had, at a minimum, an obligation to advise the appropriate professional authorities of a possible conflict pursuant to DRPC 8.3(a). Rule 8.3(a) provides:

> A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall inform the appropriate professional authority.

As an initial matter, the court notes that Kossak's opening brief stated that the issue upon which he was moving for suppression was that "neither Special Agent Brouwer nor AUSA Richard Andrews advised Mr. Kossak of this conflict of interest until November 2002." *See* D.I. 64 at 10. Notably, nowhere in this brief did Kossak

---

**3.** The DRPC were amended effective July 1, 2003. While the court is mindful that the current DRPC no longer contains the above-cited commentary language, this does not

change the court's analysis, as the commentary at the time of the Kossak interviews must control this inquiry.

cite to Rule 8.3(a), nor did he suggest that he was alleging a violation of this rule. It is improper for Kossak to have reserved new legal arguments for his reply brief. Despite this procedural default, however, the court will nonetheless address this contention.

 There can be no dispute that the Delaware Supreme Court alone establishes and governs the Bar. *See In re Appeal of Infotechnology, Inc.*, 135 Vt. 585, 582 A.2d 215, 220 (Del.1990). As that court has held, "the Rules [of Professional Conduct] are to be enforced by a disciplinary agency, and are not to be subverted as procedural weapons." *Id.* Additionally, the court noted that "nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty." *Id.* Thus, "absent misconduct which taints the proceeding, thereby obstructing the orderly administration of justice, there is no independent right of counsel to challenge another lawyer's alleged breach of the Rules outside of a disciplinary proceeding." *Id.* at 221, 382 A.2d 215.

In the present case, the court must conclude that the record does not reflect that the Government's knowledge of Kulesza's possible breach of his ethical duties tainted Kossak's interviews. While it is true that the Delaware Supreme Court ultimately sanctioned Kulesza by suspending him from the practice of law, the court will not be led by hindsight. Additionally, the Government's knowledge of Kulesza's possible conflict occurred during the pre-Indictment investigative stage. Kossak has not adduced any evidence from which the court could conclude that, at the time of his interviews, the Government had evidence sufficient to call into question its ethical obligations. On these facts, the court is not persuaded that the Government's actions rose to the level of a Fifth Amendment Due Process violation requir-

ing suppression. In so holding, however, the court expresses no opinion on whether, in fact, the Government breached its ethical obligations pursuant to Rule 8.3(a).

On these grounds, the court will deny Kossak's motion to suppress.

### B. Motions To Quash

There are two motions to quash presently pending before the court. Both of these motions are directed to the Government's Rule 17 trial subpoena of Kulesza's former law firm, Fox Rothschild. Through this subpoena, the Government seeks financial records including escrow amounts maintained by Fox Rothschild for Kossak or his company, KRA, and financial records showing the movement of legal fees paid by Kossak to Kulesza.

Kossak's motion seeks to quash the subpoena on the following four grounds: (1) the subpoena seeks to circumvent Federal Rule of Criminal Procedure 16; (2) the Government has not met its burden of proving relevance; (3) the responsive materials contain attorney-client privileged information; and (4) producing the information would violate various ethical rules. The Fox Rothschild motion only asserts the latter two grounds.

### 1. The Subpoena Does Not Circumvent Rule 16

 While the court agrees with Kossak that Federal Rule of Criminal Procedure 16 limits the Government's right to discovery, it must disagree that Rule 16 is relevant to the present inquiry. Specifically, the subpoena in question is addressed to Fox Rothschild, a non-party to this litigation. It seeks financial records belonging to the firm, which are not the defendant's property. As such, the records are no different in this regard from those kept by any other institution that might have financial records concerning Kossak, such as

his bank or accountant. Rule 16 is thus inapplicable.

### 2. Relevance

██ Kossak further argues that the Government has failed to demonstrate the relevance of the information it is seeking. Specifically, Kossak argues that the documents sought relate to activities in November and December 2002, approximately five months after he was indicted. Thus, Kossak contends that, "[a]bsent any temporal relationship between the basis for the subpoena and the items sought to be subpoenaed, the government has not shown how the subpoenaed records would be relevant." D.I. 70 at 5.

The court concludes that the Government has made a sufficient showing of relevance to uphold its subpoena. In its responsive brief, the Government has indicated that the information now available indicates that Kulesza obtained a loan from the already-indicted Kossak for $30,000. However, Kulesza paid that money back almost immediately. Nor did Kulesza make use of the $30,000 loan for any particular purpose. Indeed, in November, the only activity in the Wilmington Trust account after a November 4 deposit are cash withdrawals that Kulesza says went to Kossak. In December, the only activity prior to when the loan was repaid are the remaining cash withdrawals and a mortgage debit.

The Government maintains that Kulesza's own statements and the available records indicate that he did not pay the money back to Kossak in an easily identifiable way. Rather, he paid $10,000 via check to "National Builders" and the balance by numerous small cash withdrawals—all in a very short time, without making any use of the borrowed funds.

Additionally, the Government contends that Kulesza received funds from Kossak via another questionable source. On January 24, 2001, a check was drawn on Childerston's real estate escrow account. This check was deposited in an escrow account operated by Kulesza's former law firm. Childerston is an unidentified co-conspirator of the fraudulent scheme alleged in the Indictment. Indeed, his escrow account was the vehicle for the allegedly improper disbursement of funds from many of the mortgage loans described in the Indictment. Curiously, the check does not appear to be associated with a real estate settlement, suggesting to the Government that it too represents funds that Kossak intended to conceal.

Based on the foregoing, the Government asserts that the information sought indicates that Kossak is hiding proceeds of the crimes alleged in the Indictment by running them through Kulesza's bank accounts. To this end, the information demonstrates that Kossak received substantial proceeds from the allegedly fraudulent schemes involving Infinity. Further, to the extent legal fees were routed by Kulesza directly, or indirectly, back to Kossak, this would be further evidence of efforts to hide money. The fact that some of these activities may have occurred post-Indictment is another indication that Kossak would be attempting to cover his paper trail of proceeds in light of the Indictment. According to the Government then, this information is probative of guilt. On these facts, the court concludes that the Government has met its burden of demonstrating that the information sought is relevant.

### 3. The Attorney–Client Privilege

██ The movants next challenge the subpoena on the grounds that the information sought is privileged. For the following reasons, the court concludes that the movants have failed to meet their burden of demonstrating the applicability of the privilege.

■ The Third Circuit has stated that the attorney-client privilege protects only communications whose purpose is to secure primarily either (1) an opinion of law; (2) legal services; or (3) assistance in some legal proceeding, and not for the purpose of committing a crime or tort. *See In re Grand Jury Investigation,* 599 F.2d 1224, 1233 (3d Cir.1979). The burden of proving the applicability of the privilege rests on the party asserting the privilege. *See In re Grand Jury Empanelled February 14, 1978,* 603 F.2d 469, 474 (3d Cir.1979). Furthermore, the Third Circuit has consistently held that "in the absence of unusual circumstances, the [attorney-client] privilege does not shield the fact of retention, the identity of clients, and fee arrangements."[4] *In re Grand Jury Investigation (Tinari),* 631 F.2d 17, 19 (3d Cir.1980); *see also In re Grand Jury,* 789 F.Supp. 693, 695 (D.Md.1992) (noting that case law overwhelmingly supports the proposition that the privilege does not cover disclosure of fee payments).

In the present case, neither Fox Rothschild nor Kossak have introduced any evidence that the information sought by the subpoena is anything other than a record of the fee arrangement between Kossak and his former attorney. Instead, both parties merely assert, without more, that the subpoenaed materials "contain information that is protected by the attorney-client privilege." D.I. 62 at ¶ 8; D.I. 63 at 5(B). This conclusory statement, or others like it, is simply insufficient for the court find that the information sought is privileged.

### 4. The Delaware Rules of Professional Conduct

■ Finally, the movants contend that the Delaware Rules of Professional Conduct prevent them from revealing the sought information. An extended discussion addressing this argument is not necessary. The court will note simply that the drafters of Rule 1.6 acknowledged the self-evident principle that an attorney who produces information pursuant to a court order does not violate Bar disciplinary rules. *See* Rule 1.6, comment (noting that "[t]he lawyer must comply with the final orders of a court or other tribunal of competent jurisdiction requiring the lawyer to give information about the client.").

## IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Kossak's Motion to Suppress (D.I.64) is DENIED.

2. Kossak's Motion to Quash (D.I.63) is DENIED.

3. Fox Rothschild's Motion to Quash (D.I.62) is DENIED.

---

**4.** A fee arrangement may become privileged if the person asserting the privilege can demonstrate "a strong probability that disclosure of the fact of retention or of the details of a fee arrangement would implicate the client in the very criminal activity for which the advice was sought." *In re Grand Jury Investigation,* 631 F.2d at 19. There has been no showing of such a situation in the present case, let alone a showing of a "strong probability" that this circumstance exists here. The court thus finds that this exception does not apply to this case.