

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-9-1995

# United States v Veksler

Precedential or Non-Precedential:

Docket 94-1982

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation
"United States v Veksler" (1995). *1995 Decisions*. Paper 214.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/214

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

———————————

No. 94–1982

———————————

UNITED STATES OF AMERICA

v.

IGOR VEKSLER,

Appellant

———————————

No. 94–2079

———————————

UNITED STATES OF AMERICA

v.

RICHARD MCNAUGHTON,

Appellant

———————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Nos. 93–cr–00147–8, 93–cr–00147–10)

———————————

Submitted Pursuant to Third Circuit LAR 34.1(a)
July 21, 1995

Before: SLOVITER, Chief Judge,
SCIRICA and McKEE, Circuit Judges

(Filed:  August 9, 1995)


Joel I. Fishbein
Law Office of Jack Meyerson, Esq.
Philadelphia, PA  19103

        Attorney for Appellant Igor Veksler

Robert E. Welsh, Jr.
Philadelphia, PA  19103

1

Attorney for Appellant Richard McNaughton

Loretta C. Argrett
  Assistant Attorney General
Robert E. Lindsay
Alan Hechtkopf
Gregory V. Davis
  United States Department of Justice
  Tax Division
  Washington, DC 20044
Robert E. Courtney, III
Mary E. Crawley

Of Counsel:
   Michael R. Stiles
   United States Attorney
Office of United States Attorney
Philadelphia, PA  19106
        Attorneys for Appellee

_____

OPINION OF THE COURT
_____

SLOVITER, Chief Judge.

Richard McNaughton and Igor Veksler appeal from the judgments of conviction and sentences entered against them by the district court.  For the reasons set forth below, we will affirm the district court's orders.

I.

Facts and Procedural History

During 1991 and 1992, McNaughton and Veksler were involved in a scheme to evade federal and state taxes on sales of number two oil, a product that can be used as either home heating oil or diesel fuel.  During this period, no taxes were imposed by the federal government or either New Jersey or Pennsylvania on the sale of number two oil for use as home heating oil.  In

contrast, the United States, New Jersey and Pennsylvania did tax the sale of number two oil when it was to be used as diesel fuel, and imposed that tax on the producer or importer who first sold the oil to a purchaser that did not hold a Registration for Tax-Free Transactions (IRS Form 637).

The tax evasion scheme in which McNaughton and Veksler participated involved the use of "daisy chains," a series of paper transactions through numerous companies, some of which were largely fictitious. In each "daisy chain," the change in characterization of number two oil from tax-free home heating oil to taxable diesel fuel was effected through the use of a "burn company," which would purchase number two oil as tax-free home heating oil and then sell it to another company as diesel fuel. The burn company, which typically held an IRS Form 637, would produce invoices to its purchaser reflecting that the diesel fuel taxes had been paid and that the taxes were included in the price. Although the burn company was liable for the payment of taxes on the oil, it paid no taxes and typically existed for a brief time and then disappeared. The participants in the scheme took commissions on the sales at the step in which each participated.

On September 19, 1993, the United States filed a superseding indictment charging eighteen different defendants with various offenses related to the "daisy chain" operation. Both McNaughton and Veksler were charged with one count of conspiracy. McNaughton was also charged with twenty-three counts of wire fraud, three counts of attempted tax evasion, and RICO

3

conspiracy.[1]  In addition to the conspiracy count, Veksler was charged with six counts of wire fraud and one count of attempted tax evasion.

On May 23, 1994, after a twenty-day trial, the jury convicted McNaughton on all counts.  Veksler was convicted of the conspiracy and wire fraud counts and acquitted on the tax evasion counts.  McNaughton was sentenced to a prison term of forty months, five years of supervised release, and a special assessment of $1,400.00.  Veksler was sentenced to a prison term of twenty-six months, followed by three years of supervised release.  These appeals followed.

## II.

## Discussion

### A. Appeal No. 94-2079--McNaughton

McNaughton was the president of BELL/ASCO, a Pennsylvania corporation that was in the business of making purchases and sales of number two oil.  Prior to April 1, 1992, BELL/ASCO allegedly played a dual role in the "daisy chain" scheme by both supplying number two oil to the chain and buying oil at the end of the chain.  After April 1, 1992, BELL/ASCO served only as a supplier and a new company, ASCA/NOVA, purchased oil at the end of the chain.  ASCA/NOVA, however, operated from the same office as BELL/ASCO.

1.    Did the district court err in refusing to suppress McNaughton's statement to Perry on December 1, 1992?

---

[1] A RICO forfeiture count under 18 U.S.C. § 1963(m) was also brought against McNaughton.

4

On November 24, 1992, the government executed a search warrant at Atlantic Heating and Oil, BELL/ASCO's parent corporation. During the course of the search, McNaughton was interviewed in his office by an FBI Agent and a Pennsylvania Revenue Enforcement Officer. Sometime during the interview, McNaughton left his office to speak with Mr. Thomas Smida, an attorney who had arrived to represent Atlantic in connection with the execution of the search warrant. After conferring with Smida, McNaughton informed the agents that Smida did not want him to make any more statements. Later, Smida was present when an agent elicited background information from McNaughton. Smida, however, halted the interview when an agent asked McNaughton about his tax returns. Smida was also present when McNaughton's briefcase was searched.

On November 30, 1992, FBI Agent Sid Perry called McNaughton and invited him to the FBI office in Philadelphia to review the evidence against him. On December 1, 1992, McNaughton went to the FBI office, where he was interviewed by Agent Perry. During the course of the interview, McNaughton admitted (1) that he was involved in "daisy chain" deals, (2) that the price of oil purchased through the "daisy chains" was too low for taxes to have been paid, (3) that ASCA/NOVA was established in order to avoid BELL/ASCO's appearance at both ends of the chains, and (4) that he had received commission payments for his participation in the "daisy chain" scheme. At no time during the interview did McNaughton state that he was represented by Mr. Smida or any other counsel.

5

McNaughton contends that because he was represented by Smida at the time of Agent Perry's questioning, the district court erred by refusing to suppress his statement. McNaughton argues that Perry violated Rule 4.2 of the Pennsylvania Rules of Professional Conduct by questioning him,[2] and that suppression is the appropriate sanction.

Rule 4.2 of the Pennsylvania Rules of Professional Conduct provides, in relevant part, that:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Pa.R.P.C. 4.2. As the district court concluded, in order for McNaughton to prevail on his motion to suppress the court would have to find (1) that the Rule applied to Agent Perry, although he is not an attorney, (2) that McNaughton was represented by counsel when Perry interviewed him on December 1, 1992, or that McNaughton is otherwise entitled to protection under the Rule, and (3) that suppression of the statement is an appropriate remedy for a violation of the Rule.

The district court concluded that McNaughton was not represented by counsel at the time of the interview. There is adequate support in the record for this conclusion. During the execution of the search warrant at Atlantic, Smida represented

---

[2]The Pennsylvania Rules of Professional Conduct are applicable to all actions before the United States District Court for the Eastern District of Pennsylvania. See Rule 14.IV(B) of the Local Rules of Civil Procedure for the United States District Court for the Eastern District of Pennsylvania.

6

himself as the "company" attorney, and never suggested that he represented McNaughton. App. at 722. McNaughton also referred to Smida as his employer's attorney, and never suggested that Smida represented him in a personal capacity. App. at 723. In addition, on November 25 or 26, 1992, Atlantic informed McNaughton that it would not represent him in connection with this matter and that he should retain personal counsel. App. at 722. Indeed, at the conclusion of the December 1, 1992, interview, McNaughton suggested to Perry that he might retain an attorney and asked for Perry's opinion of two possible candidates. App. at 725. Finally, and most significantly, McNaughton testified at the suppression hearing that Smida was not representing him personally at the time of the December 1, 1992 interview. App. at 2869-70. In light of these facts, we cannot characterize the district court's conclusion that McNaughton was not represented at the time of the interview as clearly erroneous. Thus, McNaughton may not invoke the protections of Rule 4.2.

Nor does McNaughton have standing to invoke Rule 4.2 on Atlantic's behalf. See, e.g., Rakas v. Illinois, 439 U.S. 128, 133-34 (1978); United States v. Fortna, 796 F.2d 724, 732-34 (5th Cir.) (defendant lacks standing to assert violation of a third-party's attorney-client privilege), cert. denied, 479 U.S. 950 (1986). Although Rule 4.2 applies to communication with persons having managerial responsibility on behalf of a represented organization, see Pa. R.P.C. 4.2 (Comment), we need not decide whether Perry's questioning of McNaughton violated Rule 4.2 as it

7

applies to Atlantic, because McNaughton could not invoke any such violation as a basis for his suppression motion.

It follows that the district court did not err in denying McNaughton's motion to suppress his statements to Perry on December 1, 1992.[3]

> 2. Did the district court err in denying McNaughton's motion to suppress the wiretap information?

McNaughton contends that the district court erred by refusing to suppress the wiretap information in this case because the warrant for those wiretaps was granted on the basis of information obtained through the use of a pen register. While McNaughton acknowledges that the United States Supreme Court upheld the use of pen registers without a warrant in Smith v. Maryland, 442 U.S. 735 (1979), he contends that the Smith decision was based upon the fact that pen registers were incapable of intercepting conversations. McNaughton argues that modern technological advances, which have permitted the development of pen registers that can be turned into listening devices with the mere turn of a switch, merit reconsideration of the Supreme Court's position. At a minimum, he reasons, he should be permitted to conduct discovery regarding the use of the pen register and the government policies regarding such use.

---

[3]Because we find that McNaughton was neither represented at the time of the interview nor otherwise entitled to the protections of Rule 4.2, we need not address whether suppression is the appropriate remedy for a violation of Rule 4.2.

We would not be so presumptuous as to limit Smith, a Supreme Court decision, in the manner suggested by McNaughton. In any event, McNaughton concedes that he has no evidence that the pen register was used to record any information other than telephone numbers. The mere suggestion that pen register equipment is now capable of misuse does not give us a basis to depart from the controlling precedent of the Smith case. The district court therefore did not err in failing to suppress the wiretap and in concluding that McNaughton is not entitled to additional discovery on that issue.

> 3. Did the district court err in declining to order the government to disclose information regarding Hurchalla's status as a subject of a grand jury investigation?

McNaughton filed a post-trial motion for information on the status of a grand jury investigation in connection with Charles Hurchalla, one of the government's trial witnesses, at the time that Hurchalla began to cooperate with the government. McNaughton suggests that by failing to disclose this information, the government may have violated its obligations under Brady v. Maryland, 373 U.S. 83, 87 (1963), and Giglio v. United States, 405 U.S. 150, 153-55 (1972). The district court denied McNaughton's request, holding that the outcome of the trial would not have been different if the government had disclosed the requested information. App. at 263-64.

McNaughton asserts that the grand jury investigation conducted by the Office of the Inspector General of the

9

Department of Transportation concerned possible fraud and false statements in connection with minority set-aside programs. The only possible relevance of this information, sought at this late date, would be in support of a motion for a new trial. In order to establish a Brady violation, a defendant must first demonstrate that the prosecution failed to disclose pro-defense evidence "actually or constructively in its possession or accessible to it." United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991).

McNaughton does not suggest that the prosecution had actual knowledge or cause to know of the ongoing nature of the investigation of Hurchalla. All criminal history checks of Hurchalla were negative and Hurchalla himself told the prosecution that the investigation had occurred in the 1980s. Constructive knowledge can only be found where the defense has made a specific request for the information. See United States v. Joseph, 996 F.2d 36, 40-41 (3d Cir.), cert. denied, 114 S.Ct. 357 (1993). The defense made no such request prior to trial, even though it had information regarding the existence of the investigation. Under these circumstances, we cannot conclude that the prosecution committed a Brady violation. Id. at 41.

Moreover, not every failure to disclose evidence favorable to the defense requires a reversal of a conviction. See United States v. Thornton, 1 F.3d 149, 158 (3d Cir.), cert. denied, 114 S.Ct. 483 (1993). Rather, the undisclosed evidence must also be material. Id. "'[E]vidence is material only if there is a reasonable probability that, had the evidence been

10

disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.'" Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985) (Opinion of Blackmun, J.)).

McNaughton contends that the undisclosed evidence could have led the jury to conclude that Hurchalla's testimony was designed to further his own interests in connection with the ongoing grand jury investigation.  As the government notes, inasmuch as Hurchalla was unaware of the ongoing nature of the investigation and Hurchalla never asked the government to intercede on his behalf in connection with any such investigation, it is unlikely that the jury would have rejected Hurchalla's testimony on the basis of evidence regarding the ongoing grand jury investigation.

We note also, as the district court concluded, that the extensive evidence regarding BELL/ASCO's involvement in the "daisy chain" scheme provided ample evidence of McNaughton's guilt.  App. at 1616–22, 1634.  There was testimony by Nadezhda Shnayderman that McNaughton received commissions for his participation in the scheme.  App. at 1204–05.

We therefore conclude that the district court did not err in refusing to allow McNaughton to conduct further discovery into the status of the grand jury investigation.

4.   Did the district court err in imposing McNaughton's sentence?

11

McNaughton raises various challenges to the district court's application of the sentencing guidelines. We exercise plenary review over legal questions about the meaning of the sentencing guidelines, but apply the deferential clearly erroneous standard to factual determinations underlying their application. See United States v. Collado, 975 F.2d 985, 990 (3d Cir. 1992).

First, we find no error in the district court's imposition of a two-level upward adjustment under U.S.S.G. §2T1.1(b)(2) for McNaughton's use of "sophisticated means" to impede discovery of the tax offense. Application note 4 to section 2T1.1 states that "'sophisticated means' . . . includes conduct that is more complex or demonstrates greater intricacy or planning than a routine tax evasion case." U.S.S.G. § 2T1.1, comment. (n.4). The commentary continues by stating that "[a]n enhancement would be applied, for example, where the defendant used . . . transactions through corporate shells or fictitious entities." Id. The "daisy chain" scheme employed by McNaughton in this case is plainly covered by this language.[4]

Nor did the district court abuse its discretion in declining to grant a two-level reduction under U.S.S.G. § 3E1.1 for McNaughton's acceptance of responsibility. Although

---

[4] McNaughton contends that the use of a "sophisticated means" enhancement is duplicative and improper where the state and federal tax losses were combined to calculate the offense level under the Tax Table at U.S.S.G. § 2T4.1. The imposition of a "sophisticated means" enhancement under § 2T1.1(b) is unrelated to the calculation of the base offense level from the tax loss under § 2T1.1(a).

McNaughton made significant admissions to investigating officers during the execution of the search warrant and to Agent Perry during the December 1, 1992 interview, the record does not support the conclusion that he admitted that he personally had committed the crimes charged in the indictment. Moreover, as application note 2 of section 3E1.1 suggests, in most cases, "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt . . . ." U.S.S.G. §3E1.1, comment. (n.2).

At sentencing McNaughton sought a downward departure under U.S.S.G. § 5H1.4 due to his medical condition, in that his lung function was seriously decreased. From our review of the record, we conclude that the district court's refusal to depart was based not on a belief regarding its authority to depart, as McNaughton argues, but on McNaughton's failure to present evidence sufficient to warrant an exercise of the court's discretion under section 5H1.4. The district court's refusal to exercise its discretion to grant a downward departure pursuant to section 5H1.4 is therefore not subject to review by this court. See United States v. Gaskill, 991 F.2d 82, 84 (3d Cir. 1993).

B.   Appeal No. 94-1982--Veksler

Veksler was the operator of one of the "daisy chain" participants, I.V. Enterprises, a Wisconsin corporation that held an IRS Form 637, a Pennsylvania oil company franchise tax exemption certificate and a New Jersey Special B license. Between July 1991 and December 1991, I.V. purchased approximately

3,486,000 gallons of number two oil from Self Oil and sold it, on paper, to Keroscene, Inc., which served as a burn company in the same "daisy chain."  I.V. never received payment for the oil from Keroscene, however.  Instead, IV received wire transfers from companies to which Keroscene sold the oil.

    1.   <u>Was there sufficient evidence to support the jury's guilty verdict on Counts 1-7?</u>

Veksler argues that the government failed to present evidence sufficient to support his wire fraud and conspiracy convictions.  In particular, Veksler contends that the government failed to present evidence to support the conclusion that Veksler had the requisite level of intent to support his convictions under 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 371 (conspiracy).

A "claim of insufficiency of the evidence places a very heavy burden on an appellant." <u>United States v. Gonzalez</u>, 918 F.2d 1129, 1132 (3d Cir. 1990) (quotation and citation omitted), <u>cert. denied</u>, 498 U.S. 1107 (1991), <u>cert. denied</u>, 499 U.S. 968 (1991), <u>cert. denied</u>, 499 U.S. 982 (1991).  In evaluating the sufficiency of the evidence to sustain a conviction, the evidence at trial is considered in the light most favorable to the government.  The "'evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt'." <u>United States v. Sandini</u>, 888 F.2d 300, 311 (3d Cir. 1989) (quoting <u>United States v. Cooper</u>, 567 F.2d 252, 254 (3d Cir. 1977)), <u>cert. denied</u>, 494 U.S. 1089 (1990). Instead,

14

this Court reviews the evidence to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

In order to convict a defendant of wire fraud under 18 U.S.C. § 1343, the government must prove, inter alia, that the defendant participated in the scheme with the specific intent to defraud. In Re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1249 (3d Cir. 1989). In order to convict a defendant of conspiracy to defraud the United States under 18 U.S.C. § 371, the government must prove, inter alia, that the defendant intended to defraud the United States. While the parties appear to disagree on whether section 371 requires a showing of "willfulness" on the part of the defendant, they do agree that in order to demonstrate the requisite intent to support Veksler's convictions, the government must demonstrate both (1) that Veksler knew of the obligation to pay taxes on the oil sold as diesel fuel and (2) that he knew that the purpose and effect of his actions was to avoid the payment of such taxes. See Appellant's Brief at 15; Appellee's Brief at 38-39.

A review of the record in this case demonstrates that the government satisfied its burden of presenting sufficient evidence upon which a jury could have based its conviction. Dimitry Belokopytov, Veksler's associate at I.V. Enterprises, testified that he instructed Veksler to send form letters regarding meetings that never occurred to other participants in the daisy chain scheme. App. at 839-41. Belokopytov also

15

instructed Veksler to send invoices to Keroscene.  The payments to I.V., however, were all made by Romans Penn.  These facts are sufficient to permit the jury to infer that Veksler was aware that his company was not engaged in legitimate business activities.  Moreover, Belokopytov also explained to Veksler that it was "very important" that I.V.'s papers demonstrate that it bought only heating oil and not diesel fuel because heating oil was not taxed, while diesel fuel was taxed.  App. at 828-29. This testimony was sufficient to permit the jury to infer that Veksler knew about both the tax obligations regarding the sale of diesel fuel and the tax evasion goals of the scheme in which he participated.[5]  We thus reject Veksler's contention that there was insufficient evidence of his specific intent.[6]

> 2. Did the court err in refusing to depart from the sentencing guidelines due to Veksler's degree of culpability?

Veksler also argues that the district court erred in refusing to depart from the base offense level applicable to him under the Sentencing Guidelines.  Under U.S.S.G. § 2T1.1, the base offense level for offenses involving taxation is determined by the amount of the tax loss.  In this case, the district court based its calculation of Veksler's offense level on the

---

[5] This case is therefore distinguishable from United States v Pearlstein, 576 F.2d 531, 543 (3d Cir. 1978), where the government presented no substantial evidence from which the jury could infer that the defendants were, or should have been, aware of the fraudulent nature of the scheme.

[6] Because we conclude that the government presented adequate evidence to support Vecksler's convictions, we need not address the issue of whether district court's reliance upon Vecksler's testimony as an alternative basis for supporting the convictions was proper.

16

approximately $1.4 million in tax losses that could be attributed to transactions in which Veksler participated.  See U.S.S.G. §§2T1.1(a), 2T4.1.

At sentencing, Veksler requested the district court to depart from this base offense level because it overstated his culpability and because the amount of taxes lost was not foreseeable by Veksler under the evidence adduced at trial.  The district court rejected Veksler's request, and Veksler reads the court's statement as holding that it lacked the authority under the Guidelines to grant the requested departure.  We need not decide whether the district court had authority to grant the requested departure because the court found as a fact that the tax loss was foreseeable to Veksler who "participated in a very integral part of this entire daisy chain."  App. at 338.

Moreover, nothing in section 2T1.1 and its accompanying application notes suggests that a court has the discretion to depart from the base offense level established through calculation of the tax loss.  This case differs significantly from those cited by Veksler.  In United States v. Monaco, 23 F.3d 793 (3d Cir. 1994), the commentary to the guideline at issue expressly permitted a downward departure in certain limited circumstances.  Id. at 798–99.  As Veksler points out, in United States v. Stuart, 22 F.3d 76 (3d Cir. 1994), we suggested that in certain instances, a court may have the authority to depart even in the absence of explicit authorization, but that decision was limited to instances where "'a particular guideline linguistically applies but . . . the conduct [of a defendant]

17

significantly differs from the norm.'" Id. at 82-83 (quoting United States Sentencing Commission Guidelines Manual 5-6 (1992)).

Veksler has presented no arguable basis for applying the exception identified by this court in Stuart. Section 2T1.1 patently applies to Veksler, and the facts of this case lack any extraordinary circumstances that the Sentencing Commission would not have considered in formulating the guideline. See Stuart, 22 F.3d at 82. Thus, we find no error in the district court's refusal to grant the departure requested by Veksler.

### III.

### Conclusion

For the foregoing reasons, we will affirm the judgments of conviction and the sentences imposed by the district court.