

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-17-2008

# USA v. Yusuf

Precedential or Non-Precedential: Precedential

Docket No. 07-3308

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Yusuf" (2008). *2008 Decisions.* Paper 936.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/936

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-3308

_____

UNITED STATES OF AMERICA;
GOVERNMENT OF THE VIRGIN ISLANDS,

Appellant

v.

FATHI YUSUF MOHAMMED YUSUF
a/ka FATHI YUSUF;
WALEED MOHAMMED HAMED a/k/a WALLY HAMED;
WAHEED MOHAMMED HAMED a/k/a WILLIE YUSUF;
MAHER FATHI YUSUF a/k/a MIKE YUSUF;
ISAM MOHAMAD YOUSUF a/k/a SAM YOUSEF;
UNITED CORPORATION, d/b/a PLAZA EXTRA;
NEJEH FATHI YUSUF

_____

On Appeal from the District Court of the Virgin Islands
(Division of St. Croix)
(District Court No. 05-cr-00015)
District Judge:  Hon. Raymond L. Finch

_____

Argued December 11, 2007


Before:  SMITH, NYGAARD and ROTH, <u>Circuit Judges</u>

(Opinion filed: June 17, 2008)

Richard T. Morrison, Esquire
Acting Assistant Attorney General
S. Robert Lyons, Esquire  **(Argued)**
Anthony J. Jenkins, Esquire
Alan Hechtkopf, Esquire
United States Attorney
United States Department of Justice
Tax Division
P. O. Box 502
Washington, D. C.   20044

        Counsel for Appellant


Gordon C. Rhea, Esquire  **(Argued)**
Richardson, Patrick, Westbrook & Brickman, LLC
1037 Chuck Dawley Boulevard, Building A
Mt. Pleasant, SC   29464

        Counsel for Appellee

Randall P. Andreozzi, Esquire
Marcus, Andreozzi, Fickess, LLP
6255 Sheridan Way, Suite 302
Williamsville, NY    14221

Pamela L. Colon, Esquire
27 & 28 King Cross Street
Christiansted, St. Croix
USVI,   00820

John K. Dema, Esquire
1236 Strand Street, Suite 103
Christiansted, St. Croix
USVI,   00820

Derek M. Hodge, Esquire
Mackay & Hodge
P. O. Box 303678
Charlotte Amalie, St. Thomas
USVI,   00803

Thomas Alkon
Alkon & Meaney
2115 Queen Street, Suite 101
Christiansted, St. Croix
USVI,   00820

Counsel for Appellee

Henry C. Smock, Esquire
Smock Law Offices
Palm Passage, Suite B18-23
P. O. Box 1498
Charlotte Amalie, St. Thomas
USVI,   00804

Counsel for Appellee

---

O P I N I O N

---

**ROTH**, Circuit Judge:

The government has appealed the District Court's pre-trial order, dismissing from the  indictment various counts and allegations based on international money laundering.[1]   The narrow issue on appeal is whether unpaid taxes, which were unlawfully disguised and retained by means of the filing of false tax returns through  the  U.S. mail, are "proceeds" of mail fraud for purposes of sufficiently stating a money laundering offense under the federal, international money laundering statute, 18 U.S.C.  §  1956(a)(2).   We  hold  that  such  unpaid  taxes  are "proceeds" of mail fraud for purposes of sufficiently stating an

---

[1] The government also appeals from the District Court's order to release notices of *lis pendens* with respect to various properties listed in the indictment.

4

international money laundering offense. For this reason, we will vacate the orders of the District Court and remand the case for further proceedings consistent with this opinion.

I. **Background**

Because we have previously outlined the facts of this case in *United States v. Yusuf*, 461 F.3d 374 (3d Cir. 2006) and *United States v. Yusuf*, 199 Fed.Appx. 127 (3d Cir. 2006), we recite only those facts pertinent to our analysis in this particular appeal.

There are seven defendants in this case: (1) United Corporation, a family-owned business located in the Virgin Islands that operates a chain of three Plaza Extra Supermarket stores in St. Thomas and St. Croix; (2) Fathi Yusuf, the primary shareholder of United; (3) Maher "Mike" Yusuf, Fathi's son, who is a part-owner of United and manager of one of the Plaza Extra stores; (4) Waheed "Willie" Hamed, Fathi's nephew, who manages the second Plaza Extra store; (5) Waleed "Wally" Hamed, Fathi's nephew and Waheed's brother, who manages the third Plaza Extra store; (6) Isam "Sam" Yousef, Fathi's nephew, who is a resident of St. Maarten, Netherlands Antilles, and owns and operates a retail furniture and appliances store; and (7) Nejeh Fathi Yusuf, Fathi's son, who is an owner and employee of United and who participated in the operation of the Plaza Extra stores.

Because defendant United conducts business through its Virgin Islands supermarkets, it is required to comply with statutorily-mandated monthly reporting of gross receipts and

payment of tax on those receipts. Section 43(a), Title 33, of the Virgin Islands Code provides, in pertinent part, that "[e]very individual and every firm, corporation, and other association doing business in the Virgin Islands shall *report their gross receipts* and *pay a tax of four percent (4%) on the gross receipts* of such business." 33 V.I.C. § 43(a) (emphasis added). Section 44(c) provides for monthly returns and payments and states that "[t]he returns and payments required by this subsection shall be due within 30 calendar days following the last day of the calendar month concerned." 33 V.I.C. § 44(c). Thus, taxes imposed on United's gross sales receipts from its supermarkets during a particular month were due and payable on the last day of the following month.

In July 2001, the Federal Bureau of Investigation (FBI) received a suspicious activity report from the Bank of Nova Scotia in St. Thomas, U.S. Virgin Islands. The report stated that, over a four day period in April 2001, $1,920,000 (in $50 and $100 bills) was deposited into United's bank account. The FBI began an investigation which revealed that defendants allegedly conspired to avoid reporting $60,000,000 of the supermarkets' gross receipts on United's Virgin Islands gross receipts monthly tax returns and failed to pay the Virgin Islands government the 4% tax that United owed on those unreported gross receipts.[2] The investigation further revealed that

_____

[2] Specifically, after Plaza Extra Supermarkets' sales receipts were collected each day, the funds were typically transferred to the "cash room," to which only certain individuals, including defendants, were permitted access. In the cash room, Plaza

6

defendants allegedly engaged in various efforts to disguise and conceal the illegal scheme and its proceeds.[3]  Such efforts included allegedly depositing these monies into bank accounts, controlled by defendants, outside of the United States.

On September 9, 2004, a grand jury in the Virgin Islands returned a seventy-eight count, superseding[4] indictment, charging various counts relating to mail fraud, tax evasion, and

---

Extra employees counted the sales receipts and prepared bank deposit slips.  The indictment alleged that defendants directed the employees to withhold from deposit substantial amounts of cash received from sales, typically in denominations of $100, $50, and $20.  Instead of being deposited into the bank accounts with other sales receipts, this cash was allegedly delivered to one of the defendants or placed in a designated safe in the cash room.  The indictment further alleged that, from 1996 through 2001, tens of millions of dollars in cash was withheld from deposit in this manner and was not reported as gross receipts on both Virgin Islands and federal tax returns filed by United.

[3] For example, with the unreported cash, defendants allegedly purchased, and directed other individuals to purchase, cashier's checks, traveler's checks, and money orders, typically from different bank branches and made payable to outside parties, in order to disguise the cash as legitimate financial instruments and to evade federal record-keeping mandates.

[4] The grand jury handed down the original indictment in this case on September 18, 2003.

international money laundering.[5]  At Counts 3 through 43, the indictment charged forty mail fraud offenses, in violation of 18 U.S.C. § 1341, alleging in paragraphs 30 and 31 as follows:

> Beginning at least as early as in or about January 1996 and continuing through at least in or about September 2002, in the District of the Virgin Islands and elsewhere, [defendants] knowingly and willfully devised and intended to devise a scheme and artifice to defraud and to obtain money and property, specifically money

---

[5] The charges included conspiracy to commit mail fraud and structure financial transactions, in violation of 18 U.S.C. § 371 (Count 1); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), (a)(2)(B)(i) (Count 2); mail fraud, in violation of 18 U.S.C. § 1341 (Counts 3-43); international money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(I) (Counts 44-52); structuring financial transactions, in violation of 31 U.S.C. § 5324(a)(3), (d)(2) (Counts 53, 54, 77); conspiracy to evade taxes, in violation of 33 V.I.C. § 1522 (Count 55); causing the filing of false tax returns, in violation of 33 V.I.C. § 1525(2) (Counts 56-60); causing the filing of false tax returns, in violation of § 26 U.S.C. § 7206(2) (Counts 61-74); engaging in criminal enterprise, in violation of 14 V.I.C. § 605(a) (Count 75); conspiracy to engage in a criminal enterprise, in violation of 14 V.I.C. § 605(d) (Count 76); and obstruction of justice, in violation of 18 U.S.C. § 1503.  The indictment further contained an asset forfeiture allegation, pursuant to 18 U.S.C. § 982, 21 U.S.C. § 853, and 14 V.I.C. § 606.

belonging to the Virgin Islands in the form of territorial gross receipts tax revenue, by means of material false and fraudulent pretenses, representations and promises, knowing that the pretenses, representations and promises were false when made, as more particularly described in paragraphs 9 through 12 and 14 through 20[6] of this Indictment.

On or about the dates specified in each count below, the defendants, for the purpose of executing and attempting to execute and in furtherance of the aforesaid scheme and artifice to defraud and for obtaining money and property by means of material false and fraudulent pretenses, representations and promises, did knowingly cause to be sent and moved by the United States Postal Service, at the East End United States Post Office in St. Thomas, Gross Receipts Monthly Tax Returns, Forms 720 V.I., addressed to the

[6] Paragraphs 9 through 12 alleged that defendants "defrauded the Virgin Islands of money in the form of tax revenue, specifically territorial gross receipts taxes [owed by United ] as well as corporate income taxes [owed by United], by failing to report at least $60 million in Plaza Extra sales on gross receipts tax returns and corporate income tax returns" filed by United. Paragraphs 14 through 20 alleged that defendants concealed the fraud and its proceeds by smuggling checks and currency and by structuring cash transactions to evade reporting requirements.

9

Virgin Islands Bureau of Internal Revenue, St. Thomas, Virgin Islands, 00802.

At Counts 44-52, the indictment charged nine substantive international money laundering offenses, in violation of 18 U.S.C. § 1956(a)(2)(B)(i), alleging in paragraph 33 as follows:

> On or about the dates listed in each count below, in the District of the Virgin Islands and elsewhere, the [defendants] transported and transferred, and attempted to transport and transfer, monetary instruments and funds in amounts described below from a place in the United States, specifically the United States Virgin Islands, to and through a place outside the United States, specifically, Amman, Jordan, knowing that the monetary instruments and funds involved in the transportation and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, that is, mail fraud, in violation of Title 18, United States Code Section 1341.

Thus, the indictment relied on mail fraud as the predicate offense, or "specified unlawful activity," to support the money laundering charges against defendants. *See* 18 U.S.C. § 1956(a)(2)(B)(i).

10

Defendants moved to dismiss the substantive money laundering charges on the basis that any unpaid taxes disguised and retained as a result of filing false tax returns through the U.S. mail do not equate to "proceeds" of mail fraud and, accordingly, Counts 44 through 52, charging money laundering, failed to state an offense. On February 13, 2007, the District Court granted the motion and dismissed the nine substantive money laundering counts for failure to state an offense. For the same reason, the District Court also dismissed the charge of money laundering conspiracy (Count 2); struck from two structuring counts the sentence-enhancing allegations grounded upon money laundering (Counts 53 and 54); and dismissed paragraphs of Criminal Forfeiture Allegation 1, which were grounded upon money laundering. The District Court reasoned as follows:

> Defendants contend that a tax savings resulting from filing false tax returns does not "represent the proceeds of some form of unlawful activity," and that, therefore, Counts 44 through 52 fail to state an offense. In the Third Circuit, "'proceeds' as that term is used in § 1956 means simply gross receipts from illegal activity.'" *United States v. Grasso*, 381 F.3d 160, 169 (3d Cir. 2004) [*overruled by United States v. Santos*, _S.Ct._, 2008 WL 2229212 (U.S. June, 2, 2008)]. "'[P]roceeds' are something which is obtained in exchange for the sale of something else as in, most typically, when one sells a good in exchange for money." *United States v. Maali*, 358 F.Supp.2d 1154, 1158 (M.D. Fla. 2005)[,] [*aff'd*

11

*sub nom. United States v. Khanani*, 502 F.3d 1281 (11th Cir. 2007)]. The Court agrees with the final analysis in *Maali*, that "[h]aving ascertained the plain and ordinary definition of 'proceeds,' it is clear that the term does not contemplate profits or revenue indirectly derived . . . from the failure to remit taxes." *Id.* at 1160. The cost savings theory was also rejected in *Anderson v. Smithfield Foods, Inc.*, 209 F.Supp.2d 1270, 1275 (M.D. Fla. 2002):

> The money that Defendants allegedly illegally obtained to violate RICO and environmental laws, and to allegedly commit mail and wire fraud, was money that Defendants legally obtained through the operation of its business. Saving money as a result of the alleged noncompliance with the requirements of an environmental statute does not make the money illegally obtained for the purposes of the money laundering statute.

The mailing of the allegedly false gross tax returns did not result in proceeds, as that term is commonly interpreted. Accordingly, [the counts charging money laundering] are dismissed for failure to state an offense.

12

Accordingly, in the District Court's view, the *tax savings* (i.e., unpaid taxes) cannot be considered "proceeds" of mail fraud because such *tax savings* (1) represented a percentage of unreported gross receipts that were *lawfully obtained* in the day to day business of Plaza Extra Supermarket, and, thus, such tax savings cannot thereafter be categorized as "proceeds" from an unlawful activity; and (2) were merely *retained*, rather than *obtained*, money resulting from defendants' noncompliance with the Virgin Islands' gross receipts reporting statute.

On June 25, 2007, the District Court denied the government's motion for reconsideration and ordered the government to release its notices of *lis pendens* with respect to various properties listed in the indictment. The government appealed the February 13 order dismissing the substantive money laundering counts (and paragraphs) and the two June 25 orders denying reconsideration and ordering release of the notices of *lis pendens*.

## III. **Jurisdiction and Standard of Review**

The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231 and 48 U.S.C. § 1612(c). We have jurisdiction under 18 U.S.C. § 3731 and 28 U.S.C. § 1294(3).

The "sufficiency of an indictment to charge an offense is a legal question subject to plenary review." *United States v. Conley*, 37 F.3d 970, 975 n.9 (3d Cir. 1994). "An indictment is generally deemed sufficient if it: (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows

13

the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989) (internal quotation marks and citations omitted). An indictment does not state an offense sufficiently if the specific facts that it alleges "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States. v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002).

## IV. Discussion

There is no dispute that the indictment sufficiently alleges mail fraud, pursuant to 18 U.S.C. § 1341. There is also no dispute that mail fraud is a predicate offense for a charge of international money laundering, pursuant to 18 U.S.C. §§ 1956(a)(2)(B)(i) (elements of international money laundering)[7],

---

[7] The federal money laundering statute, 18 U.S.C. § 1956(a)(2), provides:

> Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States
>
> . . .
>
> > (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the *proceeds of*

1956(c)(7)(A) (the term "specified unlawful activity" includes any racketeering activity under RICO) and 1961(1)(B) (mail fraud is a racketeering activity)[8]. The narrow issue in this appeal is whether unpaid taxes unlawfully disguised and retained by means of the filing of false tax returns through the U.S. mail are "proceeds" of mail fraud for purposes of sufficiently stating an offense for money laundering.

_____

> *some form of unlawful activity* and knowing that such transportation, transmission, or transfer is designed in whole or in part--
>> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the *proceeds of specified unlawful activity*; . . .
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(2)(B)(i) (emphasis added).

[8] Under 18 U.S.C. § 1961(1), mail fraud is a "specified unlawful activity," but tax fraud simpliciter is not.

15

As a threshold matter, we first address the District Court's view that funds originally procured through lawful activity can be classified only as proceeds of that lawful activity and cannot thereafter be converted into proceeds of a specified unlawful activity.

Although the federal money laundering statute does not define what constitutes "proceeds" of a specified unlawful activity, *see United States v. Santos*, _S.Ct._, 2008 WL 2229212, at *4 (U.S. June, 2, 2008), it specifically identifies which criminal offenses constitute "specified unlawful activities." 18 U.S.C. § 1956(c)(7). The term "specified unlawful activity" covers a broad array of offenses.[9] For example, the fraudulent *concealment* of a bankruptcy estate's assets is categorized as a "specified unlawful activity." *See* 18 U.S.C. §§ 1956(c)(7)(A), 152(1) (criminalizing the concealment of assets relating to § 152). Thus, property which is required to be included in a bankruptcy debtor's estate but is instead undeclared, and thus *retained*, is "proceeds" of a bankruptcy fraud offense under 18 U.S.C. § 152(1). *United States v. Brennan*, 326 F.3d 176, 190 (3d Cir. 2003) (the defendant, debtor-in-possession, transferred bonds belonging to the

---

[9] That term is defined, in pertinent part, by reference to those criminal activities that constitute racketeering under RICO. 18 U.S.C. § 1956(c)(7)(A) (""[T]he term 'specified unlawful activity' means any act or activity constituting an offense listed in section 1961(1) of this title . . ..."). As previously noted, mail fraud is categorized as a racketeering act and thus falls within the purview of the money laundering statute.

bankruptcy estate to a third person who cased the bonds and invested the proceeds for the defendant's benefit). Moreover, simply because funds are *originally* procured through *lawful* activity does not mean that one cannot thereafter convert those same funds into the "proceeds" of an unlawful activity. *See United States v. Ladum*, 141 F.3d 1328, 1340 (9th Cir. 1998) (sustaining money laundering conviction where the defendant concealed rental income derived from lawfully operated retail stores); *United States v. Levine*, 970 F.2d 681, 686 (10th Cir. 1992) (sustaining money laundering conviction where the defendant concealed corporate tax refund checks deposited in a hidden bank account). Accordingly, we reject the suggestion that to qualify as "proceeds" under the federal money laundering statute, funds must have been *directly* produced by or through a specified unlawful activity, and we agree that funds *retained* as a result of the unlawful activity can be treated as the "proceeds" of such crime.

Furthermore, the Supreme Court, in *United States v. Santos*, recently clarified that the term "proceeds," as that term is used in the federal money laundering statute, applies to criminal profits, not criminal receipts, derived from a specified unlawful activity. 2008 WL 2229212, at * 5 (applying the rule of lenity to interpret the ambiguous term "proceeds" to mean "profits" of a criminal activity rather than "receipts"). In *Santos*, the defendants were convicted of violating 18 U.S.C. § 1956(a)(1)(A)(i)–the subsection of the federal money laundering statute that criminalizes financial transactions using the proceeds of a specified unlawful activity with the intent to promote the carrying on of such activity. The Supreme Court affirmed the trial court's decision to vacate the money laundering convictions

17

because the transactions on which such convictions were based involved the gross receipts, as opposed to the profits, of the specified unlawful activity–the operation of an illegal lottery.[10] The Supreme Court reasoned that the transactions upon which the money laundering charges were based could not be considered to have involved "proceeds" of the illegal lottery's operation because such transactions involved the mere payment of the illegal operation's *expenses* rather than the operation's *profits*.[11] *Santos*, 2008 WL 2229212, at * 6. Accordingly, we

---

[10] In that case, defendant Santos operated an illegal lottery. He employed individuals known as "runners" to collect the gamblers' bets. Upon receipt of the bets, the runners retained a small portion as their commission and handed over the remaining money to individuals known as "collectors," one of whom was defendant Diaz. The collectors would then deliver such money to Santos, who used a portion of it to pay the collectors' salaries and pay the winners. The payments to the runners, collectors, and winners were identified in an indictment as the "transactions" upon which money laundering charges were based under 18 U.S.C. § 1956(a)(1)(A)(i) (criminalizing transactions which promote criminal activity).

[11] The Supreme Court reasoned as follows:

> Transactions that normally occur during the course of running a lottery are not identifiable uses of profits and thus do not violate the money-laundering statute. More generally, a criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the

18

recognize that the Supreme Court's holding in *Santos* overrules this Court's decision in *United States v. Grasso*, which was relied upon by the District Court. *Grasso*, 381 F.3d 160, 169 (3d Cir. 2004) (holding that "'proceeds,' as that term is used in the money laundering statute, means gross receipts [from illegal activity] rather than profits").

Moreover, we have previously determined that "proceeds are derived from an already completed offense, or a completed phase of an ongoing offense, before they can be laundered." *United States v. Conley*, 37 F.3d 970, 980 (3d Cir. 1994).

Having thus elucidated the definition of "proceeds," we will next consider how the term "proceeds" relates to the predicate offense of mail fraud. The mail fraud statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or

money-laundering statute, because by definition profits consist of what remains after expenses are paid. Defraying an activity's costs with its receipts simply will not be covered.
*Santos*, 2008 WL 2229212, at * 6.

19

delivered by the Postal Service . . . shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341. Stated plainly, the elements necessary to establish the offense of mail fraud are (1) a scheme or artifice to defraud for the purpose of obtaining money or property and (2) use of the mails in furtherance of the scheme. Therefore, once these two requirements are met, mail fraud has been committed.

The Supreme Court has previously interpreted the elements of mail fraud. A scheme to defraud need not contemplate the use of mails as an essential part of the scheme so long as the mailing is "incident to an essential part of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (*citing Pereira v. United States*, 347 U.S. 1, 8 (1954) *and quoting Badders v. United States*, 240 U.S. 391, 394 (1916)). Under the mail fraud statute, the mailing must be for the "purpose of executing the scheme."[12] *Kann v. United States*, 323 U.S. 88, 94 (1944). Furthermore, a mailing cannot be said to be in furtherance of a scheme to defraud, nor can a mailing be

---

[12] In *Kann*, the defendants cashed fraudulently obtained checks at various banks, knowing that the checks would be forwarded to a drawee bank for collection. The Supreme Court found that the mailing was not material to the consummation of the scheme and thus concluded that there was no mail fraud. 323 U.S. at 94 ("It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires.").

considered even incident to an essential part of the scheme, when it occurs after the scheme has reached fruition. *Id.* at 94-95.

In *Schmuck*, the defendant was a used-car distributor who purchased used cars, rolled back their odometers and sold the vehicles to retail dealers at prices he was able to inflate by reason of the low-mileage readings. The dealers, unaware of the fraud, resold the automobiles to their customers, who also paid inflated prices. The Supreme Court held that the mailing element was satisfied by the dealers' mailings of title application forms to the state of Wisconsin on behalf of the customers, explaining that "a rational jury could have found that the title-registration mailings were part of the execution of the fraudulent scheme, a scheme which did not reach fruition until the retail dealers resold the cars and effected transfers of title." *Schmuck*, 489 U.S. at 712. Finding that the scheme would have come to an end if the dealers had lost faith in the distributor or were unable to re-sell the cars, the Court concluded that "although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme." *Id.*

Moreover, in *United States v. Morelli*, we affirmed a district court's judgments of conviction and sentence and concluded that unpaid taxes that were unlawfully disguised and retained constituted "proceeds" of wire fraud for purposes of

21

supporting a conviction on a federal money laundering charge.[13] 169 F.3d 798, 806 (3d Cir. 1999)  The defendant in *Morelli* was involved in a "daisy chain"[14] scheme which included a series of

---

[13] Wire fraud, like mail fraud, is a racketeering activity and thus a predicate offense for money laundering. *See* 18 U.S.C. §§ 1956(a)(2)(B)(i), (c)(7)(A); *see also* 18 U.S.C. §1961(1). The federal wire fraud statute, 18 U.S.C. § 1343, is nearly identical to the federal mail fraud statute. *See Morelli*, 169 F.3d at 806 (stating that "[w]ire fraud consists of (1) a scheme to defraud and (2) a use of a wire transmission for the purpose of executing, or attempting to execute, the scheme"); *see also id.* at 806 n.9 (explaining that the federal wire fraud and mail fraud statutes "differ only in form, not in substance, and cases... interpreting one govern the other as well"); *see also United States v. Tarnopol*, 561 F.2d 466, 475 (3d Cir.1977) ("[T]he cases interpreting the mail fraud statute are applicable to the wire fraud statute as well.").

[14] The elements of "daisy chain" schemes have previously been detailed in this circuit and others. *See, e.g., United States v. Sertich*, 95 F.3d 520, 522 (7th Cir.1996), *cert. denied*, 519 U.S. 1113 (1997); *United States v. Veksler*, 62 F.3d 544, 547 (3d Cir.1995); *United States v. Macchia*, 35 F.3d 662, 665-66 (2d Cir.1994); *United States v. Victoria-21*, 3 F.3d 571, 573 (2d Cir.1993); *In re Assets of Martin*, 1 F.3d 1351, 1353 (3d Cir.1993); *United States v. Tarricone*, 996 F.2d 1414, 1416-17 (2d Cir.1993); *United States v. Aracri*, 968 F.2d 1512, 1514-17 (2d Cir.1992); *United States v. Musacchia*, 900 F.2d 493, 495-96 (2d Cir.1990), *vacated*, 955 F.2d 3 (2d Cir.1991).

transactions that resulted in the embezzlement of excise taxes from fuel sales. The "daisy chain" scheme operated as follows:

> The particular scheme in which the defendants participated was termed "the Association." The Association organized a group of companies, all of which it controlled, into a "daisy chain," for the purpose of embezzling the excise taxes on the sale of certain kinds of fuel. Typically, the companies would sell oil down the chain in a series of paper transactions, through what was referred to as the "burn company." Eventually, the company at the bottom of the chain, the "street company," would sell the oil to a legitimate retailer, i.e., a particular gas station, for a price slightly below the tax-included market price. This retailer would pay money to the street company, which would send money back up the chain in a series of wire transfers.

> This scheme was illegal because it was set up as a means to avoid excise taxes. The daisy chain was established so that the burn company was the one legally responsible for collecting the excise taxes on the fuel sales and transmitting them to the government. In the Association's scheme, the burn company would collect the taxes for a time, and then disappear without ever paying the taxes to the government. As a result, the Association could keep the money representing

23

the excise taxes without the government being
able to determine where it had gone.

*Id.* at 803. On appeal, the defendant claimed that the money
represented the "proceeds" of tax fraud, not the "proceeds" of a
wire fraud, because the wiring itself had nothing to do with the
Association's coming into possession of the money. We did not
agree.

In affirming the trial court's judgments of conviction and
sentence on the money laundering charge, we held that the
money wired up through the "daisy chain" constituted
"proceeds" of wire fraud based on the nature of the *entire
ongoing fraudulent scheme*. 169 F.3d 806-07. We reasoned as
follows:

> We think the money was the proceeds of
> the *entire ongoing fraudulent venture* in which the
> Association engaged in creating the daisy chain
> scheme, and that this venture was a wire fraud
> scheme. This ongoing venture consisted of all the
> individual series of transactions upon which [the
> defendant] focuses, not the discrete series of
> transactions individually. *Although each series
> may have included discrete acts of wire fraud that
> followed the creation of the proceeds related to
> that series, the fact is that the entire program,
> encompassing all of the acts charged in the
> indictment, constituted one large, ongoing wire
> fraud scheme. Each wiring in each series
> furthered the execution of each and every
> individual act of tax fraud, and helped to create*

24

> *the proceeds involved in each succeeding series of transactions.* This is primarily because each wiring, whether it occurred before or after a given act of tax fraud, served to promote and conceal each individual embezzlement of taxes, either *ex ante* or *ex post. More precisely, each wiring, including those that occurred before a particular transaction, made it more difficult for the government to detect the entire fraudulent scheme or any particular fraudulent transaction or series of transactions.* In sum, the money gained in each series of transactions (save the initial one) was the proceeds of wire fraud because the money was the proceeds of a fraud that was furthered by the prior wirings.

*Morelli*, 169 F.3d at 806-07 (emphasis added); *see also id.* at 808 (*quoting Schmuck*, 489 U.S. at 712 ("Each wiring 'was essential to the perpetuation of [the Association]'s scheme.")). Finally, we concluded that, under the reasoning in *Schmuck*, each wiring contributed to the entire scheme and made each subsequent individual fraudulent transaction series more likely to be successful and less likely to be detected. *See Morelli*, 169 F.3d at 807.

Based upon the Supreme Court's decisions in *Santos*, *Schmuck*, and *Kann*, and our decision in *Morelli*, we hold that unpaid taxes, which are unlawfully disguised and retained by means of the filing of false tax returns through the U.S. mail, constitute "proceeds" of mail fraud for purposes of supporting a charge of federal money laundering. Here, 4% of the

25

unreported gross receipts that should have been paid as tax to the Virgin Islands but were instead included in the lump sums of money which the defendants sent to Amman, Jordan, were clearly "proceeds" of the fraudulent scheme perpetuated by defendants. Specifically, the defendants' fraudulent scheme was that of concealing certain gross receipts from the Virgin Islands government through the mailing of fraudulent tax returns in order to defraud, cheat, and deprive the government of the 4 % gross receipts taxes it was owed, thus enabling the defendants to unlawfully retain such government property and profit from their scheme. *See Pasquantino v. United States*, 544 U.S. 349, 355-56 (2005) (holding that Canada's right to uncollected excise taxes on imported liquor is "property" in its hands, depriving Canada of that money inflicts "an economic injury no less than had they embezzled the funds from the Canadian treasury."); *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) (explaining that to defraud the United States primarily means "to cheat the government out of property or money" and to deprive the government of "something of value by trick, deceit, chicane, or overreaching"). Here, the mailings were both for the purpose of executing the scheme and were material to the consummation of the scheme. *See Kann*, 323 U.S. at 94. The use of the mail to file fraudulent tax returns and fail to pay all taxes owed was not only incident to an essential part of the scheme, but also was clearly *an* essential part of the scheme because such mailings were the defendants' way of concealing the scheme itself by making the fraudulently reported gross receipts seem legitimate. *See Schmuck*, 489 U.S. at 711; *Pereira*, 347 U.S. at 8.

Furthermore, the mailings of the fraudulent tax returns resulted in "proceeds" of mail fraud based on the nature of the

26

*entire ongoing fraudulent scheme* because the unpaid taxes unlawfully retained by defendants represented the "proceeds" of a fraud that was also furthered by previous mailings. *See Morelli*, 169 F.3d at 806-07. Each mailing, whether it occurred before or after a given act of tax fraud, served to promote and conceal each month's unlawful retention of taxes, either *ex ante* or *ex post*, and made it more difficult for the government to detect the entire fraudulent scheme. *See id.* Moreover, each mailing of the fraudulent tax forms "contributed directly to the duping" of the Virgin Islands government, and subsequent mailings were essential to keep defendants' scheme going because it would have come to an end if the tax collecting authorities did not continue to receive these mailings. *See Schmuck*, 489 U.S. at 712. Accordingly, it logically follows that the unpaid taxes, unlawfully disguised and retained through the mailing of the tax forms, were "proceeds" of defendants' overall scheme to defraud the government. This scheme was both dependant on and completed by the monthly mailing of the false Virgin Islands gross receipts tax returns.

Finally, in light of the Supreme Court's decision in *Santos*, we recognize that the "proceeds" from the mail fraud in this case also amount to "profits" of mail fraud. *See* 2008 WL 2229212, at * 5-6. By intentionally misrepresenting the total amount of Plaza Extra Supermarkets' gross receipts through the mailing of fraudulent tax returns, the defendants were able to secretly "pocket" the 4% gross receipts taxes on the unreported amounts which were the property of the Virgin Islands government. *Cf., Pasquantino v. United States*, 544 U.S. 349 (2005) (recognizing no material difference between defrauding a government of taxes due and embezzling money from the

27

treasury, the Supreme Court held that unpaid tax constituted property under the wire fraud statute).  Other than some small expenses incurred in perpetuating the mail fraud–i.e., the postage stamp affixed to their monthly tax return or any other preparation fees relating to the return– the unpaid taxes retained by defendants  amounted to profits.  Once these profits were included in the lump sums sent abroad by defendants, the offense of international money laundering was complete.

## V. **Conclusion**

Based on the foregoing, we will vacate the District Court's February 13, 2007, and June 25, 2007, orders and remand this case for further proceedings in accordance with this opinion.

28